[No. B172508. Second Dist., Div. Eight. Feb. 24, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
EARL BERNARD CROSS, Defendant and Appellant.

COUNSEL

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BOLAND, J.—** ▉ This appeal is from an order denying appellant outpatient status following a hearing under Penal Code section 1604,[1] appealable as an order after judgment affecting the substantial rights of a party. (§ 1237, subd. (b); *People v. Sword* (1994) 29 Cal.App.4th 614, 619, fn. 2 [34 Cal.Rptr.2d 810].) We review the order for abuse of discretion. (*Id.* at pp. 619, fn. 2, 626.) Finding an abuse of discretion, we reverse.

### PROCEDURAL HISTORY

In 1991, appellant Earl Bernard Cross was charged with murder, and it was alleged he personally used a knife. Appellant pleaded guilty to second degree murder and admitted the knife use. Under section 1026, the trial court found appellant was not sane at the time he committed the offense and adjourned the criminal proceedings. On July 19, 1995, the court ordered appellant committed and recommended placement at Patton State Hospital until his sanity was restored, with confinement not to exceed life.

On September 24, 2003, after receiving an August 25, 2003 progress report from Patton State Hospital recommending outpatient status, the trial court ordered a formal hearing regarding appellant's conditional release under the restrictions set forth in section 1604 and related statutes. The hearing began on November 14, 2003. The court heard further testimony after expressing concern regarding the suitability of appellant's proposed placement in a skilled nursing facility. On January 9, 2004, the court denied appellant outpatient status. Appellant timely appealed from the order.

---

[1] All further statutory references are to the Penal Code.

## FACTS[2]

### 1. *The Underlying Crime*

Appellant and the victim, Kenneth Leroy Flowers, age 76, were former roommates. Flowers moved into Charles O'Brien's apartment because he feared for his safety, having been stabbed by appellant before. On August 23, 1991, appellant, then age 67, went to Flowers's apartment where they became involved in an argument. Flowers entered O'Brien's bedroom to get a metal box where Flowers kept his money. Flowers said he was having trouble with appellant. After Flowers left the bedroom, O'Brien heard appellant yelling but could not understand what appellant was saying. Appellant later came into O'Brien's bedroom and said Flowers was going to die a slow death. Appellant then took O'Brien's wheelchair, moved it into the living room, unplugged O'Brien's telephone in the bedroom, and left the scene. O'Brien made his way to the living room and saw Flowers on the sofa with blood all over him. Appellant had fatally stabbed Mr. Flowers several times in the neck. O'Brien reactivated his telephone and called for assistance. Flowers was transported to the hospital where he was pronounced dead.

O'Brien provided the police with appellant's name and location. When officers arrived at appellant's apartment, appellant came out and said, "I'm the one you're looking for. I killed the guy." Appellant told the officers, "I stabbed him. I did it for a reason. The son of a bitch is tricky prick [*sic*]. I intended to kill him and I let him know it, too."

### 2. *Evidence Presented at the Section 1604 Hearing*

#### A. *Appellant's Evidence*

##### (1) *Dr. Marie Roman, CONREP Evaluator*

Dr. Marie Roman, a clinical psychologist, was hired by the CONREP program (Conditional Release Program) run by Gateways to determine if appellant was ready to enter into the community. Appellant originally was recommended for outpatient status by Patton State Hospital in June 2001. However, he could not be placed at that time due to heart surgery. In January 2003, Dr. Roman's team, which consisted of a number of licensed psychologists, found appellant mentally stable enough for outpatient treatment, but the

---

[2] Because the judgment resulted from a guilty plea, the description of the underlying crime is taken from the probation report.

process was delayed because appellant injured himself in the hospital. In August 2003, Dr. Roman evaluated appellant again and recommended he be allowed to leave Patton, but felt he needed to be in a skilled nursing facility because she found him more physically fragile. Placement in a skilled nursing facility meant he would be under close ("24/7") supervision.

Dr. Roman, who was familiar with the facts underlying appellant's crime, agreed with the diagnosis made at Patton State Hospital that appellant suffered from schizophrenia, paranoid type. While in a decompressed state, appellant suffered from delusions, hallucinations and paranoia. Dr. Roman stated that as long as appellant complied with his medication regime, she felt he was stable enough to be placed in the conditional release program.

Dr. Roman testified that one factor she considered in determining suitability for outpatient status was behavioral stability. Appellant met that requirement as he had not verbally or physically assaulted anyone while in the hospital. Dr. Roman also found that appellant was aware he needed to take his medication in order to not be dangerous again. She also considered whether psychiatric stability had existed for at least 12 months, and appellant for the most part had been psychiatrically stable. Dr. Roman testified that appellant had occasional delusions but, unlike when he was first admitted, in the last year he had been willing to acknowledge the possibility he suffered delusions. Appellant still had some fixed delusions but his relapse prevention plan indicated he had an awareness of the symptoms of his illness and what to do if those symptoms arose. Appellant had not violated hospital rules and was compliant with medication and treatment. Appellant also had acknowledged his substance abuse problem and was aware that use of alcohol would affect his psychotropic medication and could lead to decompensation.

Although appellant still had delusions, he had not been violent while on psychotropic medication and did not act on those delusions. He was aware the delusions are a symptom of his illness rather than his reality. He acknowledged this within the last two years before the hearing.

Dr. Roman testified she could not make any predictions about appellant's dangerousness if he were not on psychotropic medication. She could only say appellant could be safely and effectively treated in the community. She testified that if appellant was not on medication, he probably would not comply with the requirements of his outpatient regimen. Dr. Roman also testified that while appellant did have awareness of his mental illness, CONREP usually preferred that patients subject to release have "insight"

regarding their illness. She also gave some weight to the fact that appellant was more physically fragile and, at age 79, was less likely to engage in violent behavior.

### (2) *Dr. Ming Pay Liu, Patton State Hospital Staff Psychologist*

Dr. Ming Pay Liu, a staff psychologist at Patton State Hospital, testified he had worked with appellant since September 2002. Dr. Liu found appellant to be a good candidate for outpatient status. He found appellant to be communicative and compliant with Patton rules. According to Patton's records, appellant was neither verbally nor physically abusive toward anyone. While some past outpatient recommendations were made with split opinions, appellant's team of psychiatrists, psychologists, social workers and nursing staff unanimously recommended appellant for outpatient status.

On cross-examination, Dr. Liu stated that he authored the August 25, 2003 report to the court making that recommendation. The report was signed and approved by other members of the clinical staff. The report states: "Given the long history, [appellant] may never be completely free of delusions. After years of intensive therapy, we believe that reducing the dangerousness of his delusions is a more reachable treatment goal than their complete remission." The report concluded with the clinical staff's opinion that appellant "will no longer be a danger to the health and safety of others, while under supervision and treatment in the community, and will benefit from such status." Dr. Liu testified those words were used in the report because that was the format the hospital used, but believed it more appropriate to say that appellant "can be safely and effectively treated in a community setting."

### (3) *Dr. Timmy Alder, Patton State Hospital*

Dr. Timmy Alder testified he had been appellant's treating psychiatrist since appellant's admission into Patton State Hospital in 1992. He testified that appellant had made good progress and had never been a behavioral problem in the hospital under treatment and medication. Appellant had never been physically or verbally assaultive and had cooperated in his treatment. Appellant had always taken his medications and was very compliant. In Dr. Alder's opinion, appellant had reached the point where he could be safely managed in the community with his medication in a supervised setting. He has held this opinion since 2001.

Under cross-examination, Dr. Alder testified that appellant was ambulatory with a walker and had experienced some difficulty with walking after fracturing his hip about eight years ago. Dr. Alder felt that appellant could be managed safely in the community if he were in a structured situation under CONREP supervision and continued to take medication. While Dr. Alder could not foresee the future, he felt appellant was safe to release to the community.

Under the court's questioning, Dr. Alder testified that appellant had dealt with his alcohol problem by participating in Alcoholics Anonymous. Although it had been an issue for appellant in the past, he did not think it would be an issue in the future. If appellant should use or abuse alcohol, it would be a significant risk. Appellant was at some risk for alcohol abuse when he was stressed but would be "okay" in a structured setting.

### (4) Skilled Nursing Facility Staff

Jerry Maxwell, the assistant administrator for the Del Rio Sanatorium and a registered nurse, testified that Del Rio was a secured, locked facility with near perpetual monitoring of its fenced grounds. Del Rio accepted outpatients under the Gateways program. In the last 10 years, Del Rio had five or six Gateways patients, none of whom had posed any problem. Del Rio had about 160 employees for about 179 patients spread over 24 hours, with a staff ratio higher than required by law. It was staffed by registered nurses, licensed vocational nurses, and certified nursing assistants. There were no psychiatrists or psychologists on the staff, but they were available as consultants.

According to Maxwell, a patient could leave the grounds with staff permission, but "involuntary holds" were not allowed to leave without permission of the individual holding authority over them. The only exception would be outdoor activities, such as a trip to Disneyland, in which case the patient would be under staff supervision.

Maxwell testified that appellant would be placed in a ward with three other patients. If he became noncompliant, the staff would take whatever steps were necessary to have him become compliant or remove him from the facility. Whether appellant's roommates would be told of appellant's criminal background would be up to appellant or his conservator.

### (5) Dr. Daniel Sussman, Clinical Director of CONREP Program

Dr. Daniel Sussman, a clinical psychologist and clinical director of the Gateways CONREP program, was familiar with appellant's case but had not personally met him. Based on the information gathered by the Gateways staff,

it was Dr. Sussman's opinion appellant could be safely monitored in the community in an outpatient program. Since assuming the clinical directorship of Gateways in September 1996, Dr. Sussman had two conditional release cases at Del Rio, both with successful outcomes. Because of his physical fragility, appellant needed to be in a skilled nursing facility, where his physical needs could be taken care of in conjunction with core services that Gateways would be coordinating.

Dr. Sussman expressed his belief that Gateways could safely manage the risk appellant posed. Should appellant decompensate, Del Rio would be obliged to notify Gateways immediately. In that case, Gateways had the capacity to provide immediate transportation to the state hospital for emergency hospitalization.

On cross-examination, Dr. Sussman testified that so long as appellant was under the supervision of the conditional release program, he would not pose a danger to the health and safety of others. However, appellant remained a danger due to his mental disorder. Dr. Sussman noted that appellant had discontinued medication on his own when he committed his offense. Under the conditional release program, appellant would be supervised and tested to ensure he was taking his medications.

The court inquired of Dr. Sussman whether his recommendation in terms of risk assessment would be the same if appellant were 30 years old and healthy, as opposed to being "too old and too sick" to stick "a knife in somebody six or eight times" again. Dr. Sussman testified that based on the "same configuration" and assuming there was the same record of progress and compliance in the hospital, he would still recommend a residential facility as a first step where there is 24-hour supervision and structured support. The person would then be ready to move to a board and care facility with home visits and toxicology screens for substance abuse. He testified that while there was a higher correlation with violent behavior in younger persons, that was not a sole factor since it was not too many years ago that appellant committed the murder.

B. *The People's Evidence*

The People did not present affirmative evidence during the hearing.

## CONTENTION

Appellant contends he presented sufficient evidence to support outpatient treatment and the trial court's refusal to grant his conditional release was erroneous.

## DISCUSSION

■ When a defendant has been determined insane at the time of the commission of the offense, the trial court may commit the defendant to a state hospital or certain public or private treatment facilities, or the court may order the defendant placed on outpatient status pursuant to section 1600 et seq. (§ 1026, subd. (a).) In the present case, following the court's finding that appellant was not sane at the time of commission of the offense within the meaning of section 1026, the court committed appellant to Patton State Hospital for a term not to exceed life or until sanity is restored.

■ Upon commitment, the medical director of the facility submits semi-annual reports to the court on the status and progress of a defendant. (§ 1026, subd. (f).) In a report filed September 24, 2003, the medical director of Patton State Hospital found that appellant would no longer be a danger to the health and safety of others while under supervision and treatment in the community, and recommended that appellant be placed on outpatient status under section 1603, subdivision (a)(1).

■ Subsequent release from a state hospital after an insanity commitment occurs upon (1) restoration of sanity pursuant to section 1026.2, (2) expiration of the maximum term of commitment under section 1026.5, or (3) approval of outpatient status under section 1600 et seq. (*People v. Sword, supra,* 29 Cal.App.4th at p. 620.) Under the last listed procedure, a defendant may be placed on outpatient status upon the recommendation of the state hospital director and the community program director with the court's approval after a hearing. (§ 1603; see *People v. Sword, supra,* at p. 620.) However, " '[o]utpatient status is not a privilege given the [offender] to finish out his sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [offender] and cause no undue hazard to the community.' [Citation.]" (*People v. Sword, supra,* 29 Cal.App.4th at p. 620.)

■ The "defendant has the burden of proving, by a preponderance of the evidence, that he is either no longer mentally ill or not dangerous." (*People v. Sword, supra,* 29 Cal.App.4th at p. 624.)

Appellant asserts that sufficient evidence at the hearing supported a finding he was a proper candidate for outpatient treatment and, therefore, the trial court's refusal to grant his conditional release must be reversed.

As noted, the proper standard of review is abuse of discretion. (*People v. Sword, supra*, 29 Cal.App.4th at pp. 619, fn. 2, 626.) Under that standard, it is not sufficient to show facts affording an opportunity for a difference of opinion. (*Id.* at p. 626.) "A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation.]" (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65 [215 Cal.Rptr. 716].)

Under section 1026.2, the trial court must determine whether the applicant "would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community." (§ 1026.2, subd. (e).) If the court determines the applicant will not, the court "shall" order the applicant to be placed with an appropriate forensic conditional release program for one year. (*Ibid.*) Under section 1604, subdivision (c), the court also "shall consider the circumstances and nature of the criminal offense leading to commitment and shall consider the person's prior criminal history." Under section 1602, subdivision (a)(3), the court must specifically approve the recommendation and plan for outpatient status.

In denying appellant's application for outpatient status, the trial court cited "[t]he problem . . . with his age and his condition," the fact that "this guy still has that disease," and the court's uncertainty that "the structure in which he would go to is such that there is more of a basis to believe—to ensure that he would take his medicine, and that he would not be a danger to the people that he is living with, or to the community."

The trial court was not required to follow the essentially unanimous recommendations of the expert witnesses. (*People v. Sword, supra*, 29 Cal.App.4th at p. 629.) However, it could disregard those recommendations only for nonarbitrary reasons. (*Ibid.*) In *Sword*, the unanimous recommendations of the physicians, psychologists and other experts who testified were contradicted by notes included in Sword's file from Patton State Hospital, and several of the experts were unaware of particular incidents related to Sword's diagnosis and progress. The trial court in *Sword* also felt that the opinions and recommendations failed to adequately consider several factors pertinent to

Sword's mental stability and dangerousness if he were released into the community, such as the role of alcohol in triggering his hallucinations and his apparently increasing religious fervor.[3] (*Id.* at pp. 627–630.)

In contrast, the record in this case revealed no reasons to doubt the adequacy of the experts' knowledge regarding appellant's history or status. Nor were any particular areas of deficiency identified by the trial court. Instead, in denying the application, the court cited, inter alia, appellant's age and condition. If anything, appellant's advanced age of 79 and frail condition supported granting the application, as they doubtless rendered appellant less physically able to move about or inflict harm upon anyone. The court also cited the persistence of appellant's mental illness. While his mental illness is certainly a highly relevant and valid factor in the court's decisionmaking process, it is not sufficient to deny the application, as appellant's burden was to show that he was *either* no longer mentally ill *or* not dangerous. Accordingly, the persistence of appellant's mental illness was not alone sufficient to deny him outpatient status if he was no longer dangerous. The undisputed evidence indicated that if appellant took his prescribed medicine and did not abuse alcohol, he would not be dangerous. While at Patton, appellant never assaulted or even verbally abused anyone, complied with hospital rules, and took his medication. He was aware that his occasional delusions were a symptom of his illness and no longer acted upon them. Thus, while he was undeniably still mentally ill, the undisputed evidence indicated he was no longer dangerous if he took his medication.

Finally, the trial court was not satisfied that the structure of the program or facility into which appellant would be placed would ensure that he would take his prescribed medicine and would not pose a danger to his roommates or the community. The court's concern is understandable, and indeed is the crux of the issue posed by appellant's application. However, the court's conclusion in this case was contrary to the undisputed evidence presented at the hearing regarding the nature of the program, facility and supervision proposed. The proposed transfer was not to an "out patient" program, but to a locked nursing facility in which appellant would reside under constant supervision. As an involuntarily placed patient, appellant would not be permitted to leave the facility without staff supervision. If it so desired, the court could, in the exercise of its continuing jurisdiction over appellant, prohibit appellant from leaving the facility without court permission. The court could also consider ordering that appellant's roommates be informed of his mental illness and potential for violence. The nursing facility's staff would administer appellant's medication, supervise its consumption, and test appellant to ensure he was taking it. If appellant decompensated, the staff

---

[3] Sword had killed a Muslim in the belief that God ordered him to do so. (*People v. Sword, supra,* 29 Cal.App.4th at p. 619.)

would be required to promptly notify the CONREP program, which could immediately transport appellant to Patton. Accordingly, the proposed transfer was to another form of supervised confinement, distinguished chiefly by the absence of psychiatrists and psychologists. The evidence presented no reason to conclude appellant would enjoy any less supervision or restriction upon his actions and movement in the nursing facility than he did at Patton State Hospital.

■ In summary, the factors cited by the trial court in denying appellant's application either are not supported by the record or are inadequate. They do not constitute nonarbitrary reasons for denying the application based upon the unanimous recommendations of appellant's treatment team. Accordingly, we reverse the court's denial of the application. Upon remand, the trial court may hold another hearing to receive any new, different or additional evidence. The court may then exercise its discretion, in accordance with the principles set forth herein, upon all of the evidence received in the prior hearing and in any further hearing.

## DISPOSITION

The judgment is reversed.

Rubin, Acting P. J., concurred.

**FLIER, J.,** Dissenting.—I respectfully dissent because I disagree with the majority that the trial court denied outpatient status on the ground that appellant was still afflicted with the disease that brought about the murder of Flowers in 1991. The record shows that the court addressed the issue whether appellant poses a danger, that it resolved this matter adversely to appellant, and that this was the reason that the court denied appellant's application for outpatient status.

I find that the court weighed all the evidence in a careful and thoughtful manner and found that appellant does not meet the standard for release to outpatient status. After noting, as appears in the court's opinion, that appellant "still has that disease," the trial court went on to state: "And what the testimony is[,] is that there is a basis to believe he won't hurt anybody. There is a basis to believe that if he doesn't take his—if he does, yes, take his medicine. [¶] The bottom line is I don't think we have it here. So I'm denying it. Okay." This shows that the court was addressing the question whether appellant was dangerous. A little later, the trial court made clear that it thought that appellant posed a danger. After discussing the advisability of an appeal, the trial court stated: "So it's just a question ultimately of convincing me or some other judge who may hear this thing that at some

point they're convinced that the structure in which he would go to is such that there is more of a basis to believe—to ensure that he would take his medicine, and that he would not be a danger to the people that he is living with, or to the community. [¶] And all I'm saying is based on what I've heard so far, I don't have reason to believe that."

The trial court's focus on the issue of the danger posed by appellant was the natural result of the crime that brought about appellant's hospitalization, and the evidence that was presented during the hearing. No one could react to the facts of Flowers's murder with anything other than a keen concern about the question whether appellant could be trusted not to commit such a crime again. And, as the majority's opinion reflects, every witness who testified addressed the question whether appellant posed a danger. The trial court itself referred to the issue as "risk assessment" when it questioned Dr. Sussman about the "likelihood" that appellant was "too old and too sick to do this again."

It is also true that there is evidence that appellant still poses a danger. Dr. Sussman testified on cross-examination by the deputy district attorney that appellant could be safely treated in the community as long as he was under the supervision of the conditional release program. However, as the majority notes, Dr. Sussman added that: "I do believe he remains a danger due to his mental disorder." When Dr. Roman was asked whether she could make a prediction as to appellant's dangerousness if he was not taking his psychotropic medications, she replied: "I'm not making any predictions, no. I'm saying that our recommendation is that we can safely and effectively treat him in the community." And Dr. Alder testified that appellant was at some risk for alcohol abuse, and that if he abused alcohol, that would be a significant risk.

As the trial court summed it up at one point, there were two concerns. One was the continuation of medications, and the other was alcohol. It is not disputed that if either concern materializes into an actual condition, appellant poses a danger. I think the trial court addressed these concerns, and at least in part based its ruling on the fact that no one could guarantee against a discontinuation of medications, or the abuse of alcohol.

Finally, the fact that this decision is consigned to the discretion of the trial court means that the trial court's decision is based at least in part on subjective considerations that are not reflected by the written record. The question whether an individual with appellant's history is, or is not, danger-ous, calls for a complex calculation where observations of the individual's demeanor may play a part. For this and other reasons, the trial court's difficult decision should be accorded deference by a reviewing court that is limited to the written record.

The trial court addressed the issue of appellant's dangerousness and resolved that issue adversely to appellant, based on evidence that is in the record. For this reason, I would affirm the order.

Respondent's petition for review by the Supreme Court was denied June 8, 2005. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.