Filed 7/26/13  P. v. Miler CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038842 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC627089) |
| v. | |
| DONALD THOMAS MILLER, | |
| Defendant and Appellant. | |

Defendant Donald Thomas Miller appeals after the trial court granted the District Attorney's petition to extend defendant's commitment under the outpatient conditional release program (CONREP), pursuant to Penal Code section 1606.[1]  Defendant contends insufficient evidence supports the trial court's determination that, due to a mental disorder or illness, defendant would be dangerous if unconditionally released.

As substantial evidence supports the trial court's findings, we will affirm the order extending defendant's outpatient commitment.

## BACKGROUND

On June 22, 2012, the District Attorney filed a petition to extend defendant's outpatient commitment, pursuant to section 1606.  The petition alleged that defendant had been committed to Atascadero State Hospital on August 1, 2007, after he was found not

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

guilty, by reason of insanity, of a violation of section 245, subdivision (a)(1). (See §§ 1026, 1026.5.) The petition alleged that defendant had been released on outpatient status to South Bay CONREP on July 23, 2010 (see §§ 1600, 1604), and that his commitment was set to expire on July 23, 2012, but that he continued "to represent a substantial danger of physical harm to others without the care and supervision" of the CONREP program.

A report from the CONREP program was filed with the petition. The report contained information about defendant's criminal offenses, mental health history, and treatment progress. According to the report, defendant's underlying offense was an assault with a knife committed on April 19, 2006; the victim was defendant's 72-year-old father. Defendant, who suffered from paranoid schizophrenia, had been "influenced by a paranoid delusion that his life was in danger." Defendant believed that his father was his enemy and that robots were shooting at him. Defendant, who had a prior history of psychotic episodes and involuntary commitments, was not taking psychiatric medications at the time of the offense.

According to the report, defendant had "participated actively in his treatment at Atascadero State Hospital." He was granted outpatient status because he was "no longer presenting with psychotic symptoms and [had] completed a relapse prevention plan." Defendant had begun to accept his mental illness and need for medications, and he was able to identify "potential high-risk situations and early warning signs" of psychiatric problems.

The report described instances in which defendant continued to experience delusions and paranoia. He had reported feeling " 'magical' " after an odd dream, and he had reported "thinking about his prior enemies." He needed assistance from CONREP staff "to prevent escalation to delusional symptoms." He continued to require "support with understanding his symptoms and implementing coping skills." In particular, he needed to avoid exposure to media and literature featuring fantasy due to his "significant

2

history of delusions with supernatural contact." Stress about his father's recent illness was also a "red flag," for which defendant required the support of treatment staff.

The report concluded that without the level of care provided in the CONREP program, defendant "would lack the ability to monitor his own mental status and could quickly decompensate, becoming dangerous once again." The report recommended that defendant continue in treatment because he remained at risk of reoffending.

On July 24, 2012, the trial court held a hearing on the petition to extend defendant's outpatient commitment. Licensed clinical social worker Chastity Piedade testified at the hearing. Defendant had been her patient at South Bay CONREP since January of 2011.

Piedade described defendant's history of delusions, hospitalization, and mental health treatment. He was first involuntarily committed in 2004. At the time, defendant believed that he was involved with gang members who were actually vampires. He believed he was a "liken" (a werewolf) and that he would die if he ate or drank anything. He had attended a party where he had been threatened by gang members, and he had been observed barking at cars. After his release, defendant failed to take his medication.

In 2005, defendant believed he was being surveilled and that someone had a contract out on his life. He called the police for help, but when the police responded, he thought they had come to kill him. He was hospitalized again, and again he failed to take his medication after being released.

Defendant's third hospitalization was two weeks prior to the 2006 assault on his father. Defendant had assaulted his father because he mistook him for an armed gang member.

According to Piedade, defendant acknowledged that he was delusional at the time of his second and third hospitalizations, but he was adamant that his first hospitalization was preceded by threats from gang members. The week before the July 24, 2012 hearing, defendant had asserted that "all of the California Norte gang [was] after him."

3

Piedade explained that defendant had difficulty controlling his behavior because his paranoid delusions created fear, which led to defendant acting out. Defendant continued to suffer from some symptoms of paranoid schizophrenia even while on medication and while receiving treatment. Earlier in the year, he had been thinking about his "enemies" and briefly believed that one of his CONREP peers was an enemy.

According to Piedade, defendant understood he needed to take his medication and reported that he liked the medications. He had not yet demonstrated that he was able to take the medications on his own, however. He was also not yet able to recognize the symptoms of his illness on his own. Piedade believed that defendant would be dangerous if he was non-compliant with his medications or in treatment less than four days per week.

Piedade understood that defendant planned to live with his father if unconditionally released and that defendant planned to get treatment and medication through a hospital. Piedade was concerned about defendant's father's ability to supervise his treatment, however. She believed that defendant was contesting the commitment extension only to please his father. Defendant had reported being happy living in the CONREP facility.

Defendant testified at the hearing. He described coping strategies that he would employ if unconditionally released. If stressed, he planned to listen to music or do art work, and he would talk to his father or a therapist. He planned to meet with a therapist once a month.

Defendant's father, Donald Miller, Sr., also testified. He was 78 years old and lived with his 80-year-old brother. He would help defendant get medication and therapy at a nearby hospital if defendant was unconditionally released.

At the end of the hearing, the trial court found that defendant was "doing really well" and was "really close," but that he was not "quite there yet." The trial court found that the CONREP "safety net" remained "critical." The trial court stated it was going to

4

"go ahead and grant the petition to extend outpatient for another year." The trial court also signed a written order, in which it stated, "The Court hereby finds that the [defendant] continues to suffer from a mental illness and would be [a] danger to the health and safety of others without involuntary treatment. The Court further finds that [defendant] would not be a danger to the health and safety of others while in supervised outpatient treatment and would benefit from continued outpatient status."

## DISCUSSION

### A.    Statutory Scheme

If a defendant is found not guilty by reason of insanity, he or she may be "confined in a state hospital for the care and treatment of the mentally disordered." (§ 1026, subd. (a).) The maximum term of commitment to a state hospital is "the longest term of imprisonment which could have been imposed for the offense or offenses of which the person was convicted." (§ 1026.5, subd. (a)(1).)[2]

A person committed to a state hospital may be placed on outpatient status "upon the recommendation of the state hospital director and the community program director with the court's approval after a hearing." (*People v. Cross* (2005) 127 Cal.App.4th 63, 72; see § 1600 et seq.) "Outpatient status shall be for a period not to exceed one year," although the court may "renew its approval of outpatient status" after a hearing. (§ 1606.) "A person may remain an outpatient as long as he will not be a danger to others and will benefit from an outpatient program. [Citation.]" (*People v. Superior Court (Henry)* (1993) 12 Cal.App.4th 1308, 1312; see § 1602, subd. (a).)

"[T]he primary purpose of the statutory scheme is protection of society." (*People v. Harner* (1989) 213 Cal.App.3d 1400, 1406.) Thus, a person subject to the scheme

---

[2] Defendant points out that his maximum term of commitment was four years. Respondent notes that defendant was placed on outpatient status before that term expired and that time spent on outpatient status does not count toward the maximum term of commitment. (See §§ 1026.5, subd. (b)(8), 1600.5.)

5

should not be released unconditionally without "a court's determination that he is no longer in need of such supervision or treatment." (*Ibid.*)

### B.    *Standard of Proof, Burden of Proof, and Standard of Review*

Defendant contends that under section 1606, the prosecution has the burden of proving, by clear and convincing evidence, that due to a mental defect, disease, or disorder, a defendant continues to represent a danger to the health and safety of others without the care and supervision of a conditional release program. Respondent contends that in a hearing to extend an outpatient commitment, a defendant has the burden of proving, by a preponderance of the evidence, that his or her sanity has been restored and that he or she is no longer a danger.

Section 1606 does not specify the standard of proof required at an annual outpatient status review hearing, nor does it specify whether the burden of proof is on the prosecution or the defendant. However, one court has indicated that the defendant has the burden of proving that he should be unconditionally released, by a preponderance of the evidence, because "the outpatient release procedure is an integral part of the restoration of sanity procedure stated in section 1026.2." (*People v. Sword* (1994) 29 Cal.App.4th 614, 621.)

In this case, the issues defendant raises concerning the burden of proof are not properly before us. The trial court did not specify whether it was placing the burden of proof on defendant or on the prosecutor, although the record suggests that the parties and trial court all believed that the prosecution had the burden of proof, since the prosecution presented its evidence first. The trial court also did not specify whether it was making the required findings by a preponderance of the evidence or by clear and convincing evidence. Further, defendant did not raise any issue concerning the burden of proof below. Even more importantly, however, our review is the same regardless of the burden of proof below: "Whether the test at the trial court is preponderance of the evidence or

6

clear and convincing evidence, a substantial evidence standard of review applies on appeal.  [Citations.]"  (*In re Mark L.* (2001) 94 Cal.App.4th 573, 581, fn. 5.)

### C.  *Sufficiency of the Evidence*

The testimony of the social worker provided substantial evidence to support the trial court's finding that defendant would still be dangerous if unconditionally released. Piedade testified that defendant suffered from symptoms of paranoid schizophrenia even while on medication and while receiving treatment.  Within the past year, he had experienced delusional thoughts about his "enemies," and he had recently asserted that gang members were still "after him."  Defendant had yet to demonstrate that he was able to take his medications on his own or recognize the symptoms of his mental illness. Piedade believed defendant would be dangerous if he was non-compliant with his medications or in treatment less than four days per week.  However, defendant planned to see a therapist only once a month.

Based on Piedade's testimony regarding defendant's history of delusions and treatment, the trial court found that the CONREP "safety net" remained "critical" for defendant.  There was evidence that defendant had previously relapsed due to his failure to take medication, and evidence that defendant had recently experienced delusions similar to the ones that led to his involuntary commitments, despite the fact that he was in treatment and on medication.  On this record, substantial evidence supports the trial court's finding that defendant would still be dangerous if unconditionally released.

### DISPOSITION

The July 24, 2012 order extending defendant's outpatient commitment is affirmed.

7

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:


_____

ELIA, ACTING P.J.


_____

MÁRQUEZ, J.