Filed 2/17/15  P. v. Webster CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>THOMAS WEBSTER,<br><br>　　　　Defendant and Appellant. | C075676<br><br>(Super. Ct. No. 93F08666) |

Defendant Thomas Webster appeals from the trial court's denial of his petition for outpatient release, claiming an abuse of discretion.  Since 1994, defendant has been confined in state hospitals, following a finding by the trial court that he was not guilty of a 1993 first degree murder because he was insane when he committed the murder.  The murder occurred when defendant was hallucinating and under the influence of methamphetamine and alcohol when he walked into a bar with a gun and shot dead a stranger, whom he believed had harmed his family.

1

We hold that the trial court's denial of outpatient release was well within its discretion because there was evidence he would be a danger to himself or others because of his mental disorder if released under supervision in the community. This included evidence that in the 20 years of his confinement, defendant has a history of impulsive, angry, and dangerous outbursts involving staff and fellow patients, some of which occurred when he was under the influence of drugs.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant's diagnosis is "methamphetamine induced psychotic disorder while intoxicated with delusions and hallucinations, along with poly substance dependence." Substance-induced psychosis disorders are defined mental disorders.

In 1994, defendant was civilly committed to a state mental hospital for the first degree murder he committed for a term of 25 years to life or until he was restored to sanity. He went to Atascadero State Hospital and when he stabilized he was transferred to Patton State Hospital.

At Patton State Hospital, the staff noted that while defendant appeared cooperative and polite, there was a "suspicio[n] of his true sincerity," and his "drug use and possession of contraband" added to the staff's "misgivings." The drug use and possession of contraband included two incidents in 1996, one when defendant tested positive for marijuana and another when he tested positive for alcohol, although he denied the alcohol use in the face of the test results.

In April 1997, defendant was transferred to Napa State Hospital. In December 1998, while a staff member was attempting to obtain a urine sample from defendant, he slammed the bathroom door open upon entering and grabbed the sample cup and bag out of the staff member's hand.

In 1999, Dr. Denis Franklin, a psychiatrist, recommended defendant's release to outpatient treatment under the supervision of the forensic conditional release program. He believed that defendant had demonstrated a "sincere commitment to sobriety."

2

Defendant had completed a chemical dependency education program at both Patton and Napa State Hospitals. Defendant's "history indicates . . . that if he begins to drink or use drugs that he will in all probability . . . become severely addicted . . . until eventually he becomes psychotic again with delusions and hallucinations . . . , at which point . . . he could then again become just as dangerous as he was the day he committed his murder." The court denied the recommendation to release defendant on outpatient status, finding that defendant was still a danger to the health and safety of others.

In July 2003, the court denied a second recommendation to release defendant on outpatient status, finding that defendant "almost never has been able to function outside a very controlled environment without abusing drugs and alcohol."

In September 2005, while still at Napa State Hospital, defendant tested positive for marijuana. He denied using the drug when confronted with the drug test results. Defendant's marijuana use coincided with him being reported by staff as "delusional." He was complaining of itching and lice crawling all over his skin and was irritable and angry.

In November 2006, defendant asked staff for Vicodin for shoulder pain. When the staff member opened defendant's door, defendant "pulled back [his] right hand into a fist with [an] angry look on [his] face." The staff member "moved backward away from [defendant], at which point [defendant] released [his] right hand out of [the] fist and stated, 'are you hallucinating?' " A few months earlier, defendant had an outburst at one of his fellow patients who was attempting to exit from the same door. Defendant thought he was being followed and asked his fellow patient, "are you following me," in an "intense loud volume and angry voice." A physician's note about defendant's behavior at that time stated that defendant had "strong paranoid undertones intending to use physicality to bully others."

In November 2009, defendant was diagnosed with cancer. He was prescribed Zyprexa to treat the anxiety related to his cancer diagnosis. Around that time, defendant

had multiple outbursts of rude and angry behavior at staff and other patients, including some that were threatening. These incidents included threatening to "kick his [roommate's] ass"; yelling at a fellow patient who was standing in line to "watch it" because he was in defendant's "personal space" and refusing to be redirected by staff or accept the fellow patient's apology; repeatedly being "extremely agitated" by lights in the hallway; responding with "F[uck] [yo]u bitch," when told by staff that he could not have hot water; inappropriately snatching a paper from a staff member's hand; telling a staff member who was making her rounds, "I'm tired of you working 24, you fucking bitch"; and yelling "fucking bitch . . . you always tell us what to do," when he was redirected by staff to wait until the dining room door opened. Finally, over a period of days, defendant was seen glaring meanly at staff with "tense muscles on his face," and then one morning when defendant was in line for utensils in the dining room, he grabbed a plastic knife and "gestured in a pointing way" toward staff.

In January 2010, defendant reported feeling more anxiety and pain, and therefore a morphine dose he was previously prescribed was increased. In September 2010, a patient who had tested positive for morphine reported that defendant had sold the patient the morphine.

In November 2011, at a treatment conference with his then-psychologist Dr. Nancy Nauman, defendant became "intensely angry" at her when she told him that his community outpatient treatment interview had been postponed for six months. He blamed her, "said some foul words to her," told her that "I fire you . . . [as] my psychologist," and left the room. Then defendant "went around saying . . . how delighted he was that he had fired his psychologist."

Dr. Robert Picker was defendant's treating psychiatrist at Napa State Hospital since October 2012, when he met defendant. He "d[id] not believe [that defendant] represents a substantial danger if released to the community." It was "[v]ery unlikely" that defendant would return to drug use because he is "painfully aware of what a

4

devastating impact his drug use had on his life and that of the victims and the family involved." Defendant wrote a "very thoughtful" wellness recovery action plan in which he outlined his "potential triggers and associated coping skills." Defendant "has been very committed to his treatment program," had a "very, very excellent attendance record through his groups," cofacilitates a substance recovery group, and was "well respected and liked [with] no behavioral problems." The community program director of the conditional release program, Rhonda Love, also recommended that defendant be released on community outpatient treatment. Regarding defendant's behavior prior to the time Dr. Picker started treating him, Dr. Picker was unaware of chart notes in defendant's file before 2010. When informed of defendant's behavior, Dr. Picker still "st[oo]d by [his] conclusion" that defendant would not be a substantial danger to the community if released on outpatient treatment.

Joan Krohn was a rehabilitation therapist at Napa State Hospital who worked with defendant since 2007 to teach him to manage his anger and use his leisure time constructively. She believed defendant would not be a danger to others if released to the outpatient program. He "embraces his sobriety," "look[s] at people differently" now, and is "not as angry as he was." She was at the November 2011 meeting at which defendant walked out when Dr. Nauman told him that his interview had been postponed. She recalled Dr. Nauman as being "[un]fair" to defendant, as Nauman was "hyper critical" of him and tried to interrupt him. Defendant told Dr. Nauman, "excuse me, I listened to you. Now it's my turn. And he basically finished and then got up and excused himself from the conference." When asked about chart notes documenting defendant's inappropriate behaviors in 2009, Krohn said she had not seen the notes.

In June 2013, Dr. Picker formally recommended in writing to the trial court that defendant be released on outpatient treatment. The recommendation was approved by the director of the Napa State Hospital.

After a hearing at which Dr. Picker and others testified, the trial court denied defendant's outpatient release based on three factors: (1) the commitment offense was murder while defendant "was in a psychotic state induced by drug and alcohol abuse; (2) "gaps . . . in some of the witnesses' knowledge . . . and they didn't . . . have knowledge of some aspects of his prior conduct or behavior" and the court "found these of significance in weighing those opinions"; (3) a weighing of the opinion of the professionals that defendant could be treated and released safely into the community against evidence that defendant's psychosis was drug and alcohol induced, he did not have sufficient emotional control to continue abstaining from using these substances when free in the community, and he also had a 20-year history of violent outbursts in confined settings, sometimes even when not under the influence of drugs or alcohol.

## DISCUSSION

### I

*The Law Related To Releasing A Defendant On Outpatient Treatment Who Is Confined To A State Mental Hospital Based On A Finding Of Not Guilty By Reason Of Insanity*

A defendant who is found not guilty by reason of insanity is "relieve[d] . . . of all criminal responsibility" for the offense. (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1432.) " '[I]n lieu of criminal punishment,' " the defendant is committed to a state hospital for treatment. (*Ibid*.) " 'The purpose of committing an insanity acquittee is two-fold: to treat his mental illness and to protect him and society from his potential dangerousness.' " (*Ibid*.)

A defendant who has been committed to a state hospital after a finding of not guilty by reason of insanity may be released if one of the following three situations occurs: "(1) the restoration of sanity . . . ; (2) expiration of the maximum term of commitment, which means 'the longest term of imprisonment which could have been imposed for the offense or offenses of which the person was convicted' [citation]; or

6

(3) approval of outpatient status" as provided by Penal Code[1] section 1600 et seq. (*People v. Dobson*, *supra*, 161 Cal.App.4th at p. 1432.)

This case involves the third situation. In this third situation, "a defendant may be placed on outpatient status if the director of the state hospital and the community program director so recommend, and the trial court approves the recommendation after hearing." (*People v. Sword* (1994) 29 Cal.App.4th 614, 620, citing § 1603.) "Under section 1026.2, the trial court must determine whether the applicant 'would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community.' (§ 1026.2, subd. (e).)" (*People v. Cross* (2005) 127 Cal.App.4th 63, 73.) "Under section 1604, subdivision (c), the court also 'shall consider the circumstances and nature of the criminal offense leading to commitment and shall consider the person's prior criminal history.' " (*Cross*, at p. 73.)

A trial court's decision to deny outpatient release status is reviewed for abuse of discretion. (*People v. Cross*, *supra*, 127 Cal.App.4th at p. 73.) In that review, the appellate court looks to whether the court relied on the proper factors and whether those factors are supported by the record. (*Id.* at p. 75.)

II

*The Trial Court Was Well Within Its Discretion*

*To Deny Releasing Defendant To Outpatient Treatment*

Defendant contends the trial court's decision denying outpatient release was an abuse of discretion because he proved he was no longer dangerous, "[m]ere drug use" was not a qualifying disorder, the evidence of dangerousness was based on speculation as to future drug use, and in any event, the evidence did not rise to the level of a serious risk of danger.

---

[1]     Further section references are to this code.

7

The trial court was well within its discretion in considering the factors it did to determine that defendant "would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community." (§ 1026.2, subd. (e).) In a delusional state brought on by long-term methamphetamine and alcohol abuse, defendant killed an innocent man, incorrectly believing the victim had harmed his family. Defendant's diagnosis is "methamphetamine induced psychotic disorder while intoxicated with delusions and hallucinations, along with poly substance dependence." Substance-induced psychosis disorders are defined mental disorders. While defendant argues that " [m]ere drug use does not qualify as a mental disorder," the court was not simply concerned with defendant's "[m]ere drug use," but what would happen if defendant was released on outpatient status and began ingesting drugs and alcohol, given that defendant had a history of ingesting these substances and also being unable to control himself in a much more confined setting, including both when he was under the influence of drugs/alcohol and when he was not.

For example, even while confined in a state mental hospital in 1996, defendant tested positive for marijuana once and alcohol and another time, denying the alcohol use in the face of a positive test. He also tested positive for marijuana in September 2005, but denied using the drug even in the face of a positive drug test. This coincided with defendant being "delusional," irritable, and angry. After defendant was diagnosed with cancer in 2009, and around the time he was prescribed Zyprexa to treat his anxiety related to his cancer diagnosis, defendant had multiple outbursts of rude and angry behavior at staff and other patients, including some that were threatening. These incidents included threatening to "kick his [roommate's] ass"; yelling at a fellow patient who was standing in line to "watch it" because he was in defendant's "personal space"; responding with "F[uck] [yo]u bitch," when told by staff that he could not have hot water; inappropriately snatching a paper from a staff member's hands; telling a staff member, "I'm tired of you working 24, you fucking bitch"; yelling "fucking bitch . . . you always tell us what to

8

do"; and grabbing a plastic knife and "gestur[ing] in a pointing way" toward staff, after he had been seen over a period of days glaring meanly at staff. Finally, in November 2011, defendant became "intensely angry" at his psychologist over the rescheduling of an interview, "said some foul words to [her]," told her that, "I fire you . . . [as] my psychologist," and left the room.

Dr. Picker was unaware of many of these incidents (as was therapist Krohn), including the one involving the plastic knife. Dr. Picker admitted that based on defendant's history of the underlying offense, as well as his other acts while in the hospital, the plastic knife incident could "[p]ossibly" "be deemed very serious." The fact that Dr. Picker and others were unaware of many of these violent and angry outbursts could reasonably call into question their recommendation for outpatient release. (*People v. Sword*, *supra*, 29 Cal.App.4th at pp. 627-628 [trial court reasonably rejected an expert's testimony recommending release when the expert was unaware of an incident evidencing "hypomanic behavior"].)

In conclusion, the trial court was well within its discretion to deny defendant outpatient release based on the factors it enumerated, which were supported by the evidence we have just recounted.

## DISPOSITION

The judgment (order denying defendant outpatient release) is affirmed.


                                                                       \_\_\_\_\_ROBIE\_\_\_\_\_, Acting P. J.

We concur:


\_\_\_\_\_MURRAY\_\_\_\_\_, J.


\_\_\_\_\_HOCH\_\_\_\_\_, J.