Filed 9/29/20  P. v. Longstreet CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ERVIN MCMICHAEL COLLINS LONGSTREET,<br><br>    Defendant and Appellant. | D076189<br><br><br><br>(Super. Ct. No. FBA700493) |

APPEAL from an order of the Superior Court of San Bernardino, Lorenzo R. Balderrama, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

In 2007, defendant Ervin Longstreet was charged with assault with a deadly weapon, with various enhancement allegations, after he stabbed a

stranger in the neck without provocation. Longstreet was found not guilty by reason of insanity, and committed to the state hospital system with an expected release date in 2023. In December 2018, Longstreet filed a petition seeking to restore his sanity for purposes of transitioning to an outpatient conditional release program (CONREP). The trial court denied the petition, finding Longstreet had not met his burden of proving he could be safely treated in the community. Longstreet contends this ruling was in error. For reasons we will explain, we disagree and affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Underlying Offense and Commitment*

In 2007, Longstreet stopped at a freeway rest stop between Barstow and Baker. Without provocation, Longstreet came up behind a physically and mentally challenged rest stop employee, and stabbed him in the neck. Longstreet drove off, but California Highway Patrol officers apprehended him within minutes. Longstreet told the officers he had no memory of stopping at the rest area. He also told them an alien had been put inside him, he had been fighting it for 10 years, and "the alien takes on his DNA."

Longstreet was charged with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)),[1] with a great-bodily-injury enhancement allegation (§ 12022.7, subd. (a)). It was further alleged that the current offense was a serious felony (§ 1192.7, subd. (c)(8)), and that Longstreet had suffered a prior conviction for a serious felony (§§ 1170.12, subds. (a)-(d), 667, subd. (b)).

Longstreet was found not guilty by reason of insanity, and committed to the Department of State Hospitals – Patton (Patton), with an expected release date of November 5, 2023.

---

[1] Further undesignated statutory references are to the Penal Code.

2

## *Petition to Restore Sanity*

While at Patton, Longstreet filed several unsuccessful petitions to restore sanity. He filed the petition at issue here in December 2018. The court conducted an evidentiary hearing on May 15, 2019, during which a forensic evaluator, Longstreet, and one of Longstreet's ex-wives testified. The court also received in evidence various criminal and psychiatric records pertaining to Longstreet.[2] The court denied Longstreet's petition on May 30.

### Dr. Mojtahedi

In response to Longstreet's petition, Sarah Mojtahedi, Psy.D., a forensic evaluator for the state hospital system, evaluated him to determine if he was suitable for outpatient placement. Her evaluation consisted of reviewing Longstreet's records, and interviewing him face-to-face for 35 to 40 minutes. Dr. Mojtahedi documented her findings in a written report, which was submitted to the trial court.

The report outlined Longstreet's history at Patton. Shortly after his commitment, he was diagnosed with schizophrenia. "When in a decompensated state, he has presented with auditory and tactile hallucinations, delusions of grandiosity, depression, racing thoughts, paranoia, aggression, and mood instability." He was also diagnosed with severe alcohol use disorder, unspecified neurocognitive disorder, and essential primary hypertension.

Longstreet was involved in several physical and verbal altercations while at Patton. In 2010, he became involved in a verbal altercation with a peer, became agitated when staff intervened, and threw a razor at the peer (it missed). In 2011, Longstreet became involved in another verbal altercation

---

[2] We grant Longstreet's unopposed request for judicial notice of exhibits 1 through 12 from the hearing.

with a peer, became "increasingly agitated" when staff attempted to intervene, and struck the peer in the face. It appeared to staff that this "incident originated from Mr. Longstreet being paranoid . . . ." He believed that his girlfriend at Patton was sleeping with the peer, and that the peer "wanted to kill him." Longstreet also punched another peer in the face in 2011.

Longstreet had verbal altercations with peers and staff in 2010, 2011, 2012, and 2016. He attempted to go AWOL in 2016. And he violated numerous hospital rules, primarily by possessing contraband (e.g., cash, tobacco, green leaves, and a lighter).

Throughout his time at Patton, Longstreet engaged in bizarre and delusional behavior. He "untiringly wrote bizarre letters to [Patton] staff throughout 2016 and 2017." In one letter, Longstreet wrote that he "was being 'inadvertently held on a hate crime,' reflecting his inability to take responsibility for his offense."

In his interview with Dr. Mojtahedi, Longstreet said it was one of his goals to work in a correctional facility. When asked if he thought this was a realistic goal in light of his history, Longstreet "chuckled sarcastically, and stated that he had 'connections in corrections' that would provide him with employment." Longstreet also became "fixated on the military," writing them letters about "a thermo-modulator machine" he had developed for them.

Longstreet was intermittently noncompliant with his mandatory psychiatric and voluntary medical (e.g., blood pressure) medications. At times, his psychiatric medications were administered by injection because he would not ingest them orally.

Longstreet presented a Wellness and Recovery Action Plan (WRAP) to Dr. Mojtahedi in connection with his pending petition. However, despite the

4

"constant recommendation that he update" his WRAP, he had merely turned in the same plan he had turned in a year earlier, "which included . . . bizarre content, most of which was unrelated to treatment and mental health issues." Thus, she deemed the plan "not usable."

During his interview with Dr. Mojtahedi, Longstreet discussed his underlying crime. He said that when he came out of a rest stop bathroom, "a worker was standing by my car . . . I panicked because I didn't know who this gentleman was. I thought he was after me, but he wasn't after me. It just blew up into a situation. I attacked the gentleman and I left the rest area."

Dr. Mojtahedi concluded in her report that "Longstreet cannot safely and effectively be treated in community outpatient treatment at this time." She found he did "not demonstrate adequate insight into his mental illness"; "was not able to identify any of his current symptoms (i.e., paranoia, grandiose delusions)"; did "not have insight into his potential for dangerousness"; and "fails to take responsibility for his actions and blames others for his current situation." She noted he "often claims he is not mentally ill and has a history of intermittent noncompliance with medical and psychiatric medications." Although Longstreet stated he understood the need to take his medication and committed to doing so, Dr. Mojtahedi found his assurances were not "genuine and contradict[ed] his belief that he is not mentally ill." She also noted Longstreet's "WRAP has remained the same for over two years and consists of the same bizarre content that is largely unrelated to treatment issues."

At the hearing, Dr. Mojtahedi largely reiterated the findings in her report. She testified that although Longstreet has "been doing well"—he was compliant with his medications, and had not had a physical altercation since

5

2011 or a verbal altercation since 2016—he "cannot safely be treated in the community" because he lacked a current WRAP or sufficient insight into his mental illness, triggers, and warning signs.

Dr. Mojtahedi stressed that "insight into the mental illness is extremely important, especially coming out of the . . . very structured setting of the hospital into outpatient treatment."

### Longstreet

Longstreet testified his mental illness consisted of schizophrenia, and traumatic brain injury caused by a car accident in 1997 when he flew through the windshield. Longstreet acknowledged he knew "something was going on" with his mental health even before the car accident. Longstreet testified he understood he needed to take his psychiatric medications.

Longstreet said his relapse prevention plan was to attend an outpatient program in Chicago, where he was originally from, and to attend individual and group therapy. He said he was aware of his past substance abuse issues, and stated that he would recognize his triggers and avoid situations that would tempt him. He expressed a desire to finish his education.

Longstreet acknowledged that when he committed the underlying offense, he had not been taking his medications and was experiencing paranoia. When asked if he was having delusions at the time of the offense, he responded, "I think most of the time, I think I've been living a delusion."

Longstreet admitted he committed a robbery in Chicago in 1991 and served a six-year prison term for that offense. He also admitted he committed domestic violence against one of his ex-wives when he feared she was going to take his son and run away with another man.

During closing arguments, Longstreet conferred with his counsel, who then informed the court that, because of memory issues associated with his

6

traumatic brain injury, Longstreet wanted "maybe a little more push" in CONREP to "complete as many programs, classes to take, take his medications. Reminders basically."

## *Ex-Wife*

One of Longstreet's ex-wives testified she lived about 80 minutes outside of Chicago and was willing to assist him with his outpatient treatment if he relocated to Chicago. She said she spoke to Longstreet on the phone every day while he was at Patton, but had only visited him once, around 2006 or 2007.

## *Ruling*

The trial court found Longstreet had not met his burden of proving he could be safely treated in the community. In support of its ruling, the court cited Longstreet's (1) lack of insight into his mental illness; (2) failure to "work[] hard to complete" and update his WRAP; (3) failure to submit to an interview with a CONREP evaluator;[3] and (4) inability "to discuss the specifics of his crime and events leading up to it," "to acknowledge his potential for dangerousness," to "articulate adequate coping strategies," and "to manage his stressors and symptoms."

The court commended Longstreet on his progress and encouraged him to make further progress, emphasizing that CONREP's unstructured environment is "a lot harder than the state hospital."

## DISCUSSION

Longstreet contends the trial court erred by denying his petition. We disagree.

---

[3]    One of the hearing exhibits indicated Longstreet agreed to participate in an interview with a CONREP evaluator, but ultimately chose not to attend.

7

When a defendant is found not guilty by reason of insanity, the trial court "shall commit the defendant to a state hospital or other appropriate public or private facility for the care and treatment of the mentally disordered, or place the defendant on outpatient status . . . ." (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1431 (*Dobson*); § 1026, subd. (a).) "One of the ways [such] a defendant . . . may be released from commitment is by applying for restoration of sanity under . . . section 1026.2." (*People v. Endsley* (2016) 248 Cal.App.4th 110, 114.) "Release under section 1026.2 is a two-step process: conditional release to an outpatient treatment program for a trial period and, if successful, unconditional release into the community." (*Ibid.*) This appeal involves the first step.

"The first step in the release process requires the defendant . . . to demonstrate at a hearing that he or she will not 'be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community.' (§ 1026.2, subdivision (e).)" (*People v. Soiu* (2003) 106 Cal.App.4th 1191, 1196, italics omitted.) At this "outpatient placement hearing" (*ibid.*), the defendant "shall have the burden of proof by a preponderance of the evidence" (§ 1026.2, subd. (k)). If the court finds the defendant has made the required showing, "the court shall order the applicant placed with an appropriate forensic conditional release program for one year." (§ 1026.2, subd. (e); see *Soiu*, at p. 1196; *Dobson*, *supra*, 161 Cal.App.4th at p. 1433.)

The parties disagree about the applicable standard of review: Longstreet argues it is the substantial evidence standard, while the Attorney General maintains it is the abuse of discretion standard. We need not resolve which standard applies because we conclude we would sustain the trial court's ruling under either. " 'The practical differences' between the abuse of

8

discretion and substantial evidence standards of review 'are not significant.' " (See *People v. Gregerson* (2011) 202 Cal.App.4th 306, 319.)  Under the substantial evidence standard, we review the entire record, drawing all reasonable inferences in favor of the trial court's finding, without making credibility decisions or reweighing evidence, and determine if substantial evidence supports the trial court's ruling.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576-578.)  And under the abuse of discretion standard, we must defer to the trial court's ruling unless it exceeds the bounds of all reason. (*People v. Cross* (2005) 127 Cal.App.4th 63, 73 (*Cross*).)  A ruling exceeds the bounds of all reason if it is based on factual findings that are not supported by substantial evidence.  (*Id.* at p. 75.)

Based on our review of the appellate record, we conclude the trial court's finding that Longstreet did not meet his burden of showing he could be safely treated in the community is supported by substantial evidence, thus demonstrating the trial court did not act arbitrarily or capriciously in denying Longstreet's petition.

The gravamen of Longstreet's appellate challenge is that there is an insufficient nexus between his past violence and his current dangerousness. We are not persuaded.

A common thread throughout Longstreet's violent behavior is his paranoia, which is a symptom of his mental illness.  He committed domestic violence against one of his ex-wives when he feared she was going to take his son and run away with another man.  He stabbed a complete stranger in the neck with a knife without provocation because he (Longstreet) was admittedly experiencing paranoia and was not taking his psychiatric medication.  And he struck a peer at Patton when he (Longstreet) was

9

paranoid that his girlfriend was cheating on him and that the peer "wanted to kill him."

Although Longstreet's most recent violent conduct occurred in 2011, substantial evidence nonetheless supports the trial court's finding that he still posed a present risk of danger if treated in the community. Dr. Mojtahedi expressly opined to this effect in her report and in her testimony at the hearing. Specifically, she opined that Longstreet presently lacked sufficient insight into his mental illness, triggers, warning signs, and dangerousness. She also found Longstreet's assurances that he would remain compliant on his psychiatric medications were not "genuine." Her opinions are supported by Longstreet's psychiatric records and his self-prepared WRAP, which further evidenced his lack of insight into his mental illness. The trial court was entitled to rely on Dr. Mojtahedi's expert opinion. (*People v. Williams* (2015) 242 Cal.App.4th 861, 872 ["A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment."].)

Dr. Mojtahedi's opinion that Longstreet was not genuine in his assurances of remaining medication-compliant distinguishes this case from those Longstreet cited in his opening brief to support the proposition that concerns about remaining compliant are impermissibly speculative. (See *Cross*, *supra*, 127 Cal.App.4th at p. 69 [doctor testified the defendant "had always taken his medications and was very compliant"]; *People v. McDonough* (2011) 196 Cal.App.4th 1472, 1492 (*McDonough*) [hospital's "recommendation states that appellant 'has *convincingly* expressed her commitment to medication adherence and overall treatment plan,' " italics

10

added].)[4]  Moreover, Longstreet, himself, cast doubt on his ability to remain medication-compliant by informing the court during closing arguments that he might not remember to take his psychiatric medications in an outpatient setting.  On this record, any concern that Longstreet would not remain compliant with his medications was not unduly speculative.

Longstreet cites *People v. Esparza* (2015) 242 Cal.App.4th 726 to support his contention that the nexus between his past violence and present dangerousness is insufficient.  *Esparza* is inapposite.  It arose in a different statutory context (*id.* at p. 729 [addressing Three Strikes resentencing under Proposition 36]), and the appellate court reversed not because of a lack of nexus between past and present dangerousness, but because the record contradicted the factual premise on which the trial court based its ruling (*id.* at p. 744).

Longstreet has established no similar factual error here.  Although he suggests the trial court and Dr. Mojtahedi misunderstood that his medication noncompliance related primarily to blood pressure medication, the record shows Longstreet was also intermittently noncompliant with his psychiatric medications.

---

4      *Cross* and *McDonough* are further distinguishable in that the defendants in those cases presented uncontradicted, unanimous expert opinion that they could be safely treated in an outpatient setting.  (*Cross*, *supra*, 127 Cal.App.4th at p. 69 ["appellant's team of psychiatrists, psychologists, social workers and nursing staff unanimously recommended appellant for outpatient status"]; *McDonough*, *supra*, 196 Cal.App.4th at p. 1491 ["All the experts testified in favor of placing appellant in outpatient treatment, even the expert appointed at the prosecutor's request."].)  The opposite is true here—the uncontradicted expert opinion indicates Longstreet *cannot* be safely treated in the community.

11

## DISPOSITION

The order is affirmed.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DATO, J.