Filed 3/28/14  P. v. Stockman CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GREGORY CHATTEN STOCKMAN,<br><br>        Defendant and Appellant. | A137286<br><br>(Sonoma County<br>Super. Ct. No. SCR20626) |

In 1993, defendant Gregory Chatten Stockman was charged with attempted murder and assault with a deadly weapon.  (Pen. Code, §§ 187 subd. (a), 664, 245, subd. (a)(1).)[1]  He was found not guilty by reason of insanity and committed to Napa State Hospital.  Defendant appeals from an order denying him conditional release under section 1026.2 to a supervised outpatient program.  We affirm.

**FACTUAL BACKGROUND**

This appeal is the latest in a series of disputes concerning defendant's treatment and rehabilitation.

Defendant has been diagnosed with Bipolar I Disorder, alcohol dependence, and Personality Disorder Not Otherwise Specified.  On two occasions, from 2001–2003 and from 2004–2006, the state hospital authorized his conditional release on an outpatient basis.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

In 2006, the trial court revoked outpatient status because there was substantial evidence he needed inpatient treatment or had refused outpatient treatment and supervision. We affirmed this order in 2008 in a nonpublished opinion. (*People v. Stockman* (July 18, 2008, A117559).) As a result of the revocation order, the trial court ruled defendant was ineligible for a final-phase restoration-of-sanity trial. We also affirmed this order. (*People v. Stockman* (Nov. 25, 2008, A120518) [nonpub. opn.].)

Recognizing that he needed to regain outpatient status as the first step in the restoration-of-sanity process, defendant, in 2009, sought outpatient status by application under section 1026.2. The trial court denied this application, crediting expert testimony defendant would be dangerous to others if released, because he had shown an unwillingness to comply with essential requirements of his treatment plan and was guarded and non-communicative with his treatment team. We concluded the court's findings were supported by substantial evidence, and affirmed in 2010 in a nonpublished opinion. (*People v. Stockman* (Oct. 22, 2010, A126735).)

Section 1026.2 allows successive applications for outpatient release or restoration of sanity, so long as the defendant waits a year after each denial. (§ 1026.2, subd. (j).) Defendant filed a new application on July 11, 2012.

The trial court requested a current report from Napa State Hospital, which defendant submitted with his court filings. (See § 1026.2, subd. (*l*) [when application for outpatient release is by defendant, "no action on the application shall be taken by the court without first obtaining the written recommendation of the medical director of the state hospital or other treatment facility"]; see also *People v. Sword* (1994) 29 Cal.App.4th 614, 635–636 [court may consider medical records of committee, despite hearsay concerns].) According to the report, defendant "should be retained for treatment, as he has a severe mental illness, continues to be a danger to others, and therefore cannot be treated in a lower level of care or a less secure facility at this time."

Although the report noted no incidents of verbal or behavioral aggression and no major relapse since defendant's initial offense, and also noted other positive developments (such as defendant having previously held a job at the hospital and defendant's new willingness to share information about his financial transactions), the report also catalogued a number of concerns. For instance, defendant, despite medication, exhibits some residual symptoms of his disorder, including "paranoia and some obsessive qualities"; defendant's most recent doctor, Dr. Sachdeb, found defendant had poor judgment and an unwillingness to follow his treatment plan; defendant was not compliant with conditions when previously an outpatient and he presently was refusing to meet with certain staff who handle the outpatient release program; and defendant was recently relocated from an "open unit" to a "closed" or "locked" unit after refusing to take Abilify, which had been prescribed (in addition to the Lithium he was already taking for the bipolar disorder) to reduce the "paranoid symptoms related to his mental illness that lead him to be excessively guarded and interfere with his treatment." According to the report, his unwillingness to cooperate in his treatment, as most seriously and recently evidenced by his refusal to take Abilify, indicates "he may not cooperate with his treatment team if he is placed in community supervision." His "excessive guardedness creates uncertainty that he will openly share symptoms with his team, making it harder to ensure they will be able to provide the optimal treatment to prevent future decompensation and the much higher risk level that such a decompensation would entail." Further, the treatment team views defendant's unwillingness to cooperate as a risk factor for dangerous behavior.

The court held a hearing on defendant's section 1026.2 application over three days in November 2012. Five witnesses testified.

Dr. Eugene Roeder, retained by defendant, reviewed defendant's records and interviewed defendant. He opined defendant would not be a danger to others if placed on outpatient release. He believed defendant would continue to take his Lithium. Although

3

prescription of medications was beyond Dr. Roeder's expertise, he was allowed to offer his opinion that defendant's refusal to take Abilify would not increase defendant's danger to society. Yet Dr. Roeder testified medication noncompliance, with Lithium in particular, would be a marker of dangerousness. Further, Dr. Roeder believed some of the hospital-imposed "compliance" conditions, such as the requirement that defendant disclose a particular loan transaction from 2006, did not relate to dangerousness, even if an uptick in spending could be, in general, a marker for relapse.

Dr. Anita Sachdeb, a psychiatrist from Napa State Hospital, treated defendant during the four to five months prior to his most recent application. She confirmed Abilify was prescribed—and recommended by three different doctors—to address defendant's guarded, suspicious, and paranoid behavior, and elaborated that Abilify also treats Bipolar I Disorder and it was hoped Abilify might address residual symptoms the Lithium had not completely addressed. She also testified defendant had problems while in the community before 1993 staying on Lithium, although there had not been a problem with Lithium since. She also noted an incident in 2007 when defendant refused Risperdal. The failure to take Abilify was a "really important criteria" and the "main concern." Even if he might continue to take Lithium as an outpatient, he would almost certainly not take Abilify or other similar drugs prescribed by his doctors. According to Dr. Sachdeb, defendant was having ongoing trouble confiding in his treatment team and they had difficulty knowing what was going on inside his head. A lack of transparency could "lead to a lot of problems" and the missing of warning signs of impending danger. Ultimately, Dr. Sachdeb concluded defendant would be dangerous if not in the hospital environment and he stopped taking his medications.

Dr. Amarpreed Singh, a senior psychiatrist at Napa State Hospital, had offered a second opinion regarding the prescription of Abilify, and believed it should be prescribed to defendant both for his Bipolar I Disorder and for his personality issues. He did not, however, offer an opinion on dangerousness.

4

Dr. Eytan Bercovitch treated defendant during parts of the preceding three years, until defendant was moved into the locked unit under Dr. Sachdeb's care. Dr. Brecovitch testified there would be concern that "if you don't know what [someone who has Bipolar I Disorder is] doing," the individual could relapse. Although defendant's hospital records might show "in full remission," that must be understood as within a secure hospital setting. Dr. Bercovitch conceded defendant did not show any dangerous behavior during his five years of outpatient release between 2001 and 2006, but said that had to be balanced against his "worrisome" lapses in taking Lithium prior to his tenure at the hospital. A past pattern of not taking medications, even if presently stopped, increases the risk of relapse and danger to society.

Finally, Ms. Christina Barasch, Director of Sonoma County's conditional release program, testified as an expert in forensic social work. She stated there were numerous things defendant had failed to do while previously on conditional release between 2001 and 2006, such as calling back his outpatient supervisor or vocational rehabilitation and reporting significant financial transactions. Ms. Barasch opined defendant was guarded and secretive in his interactions with his treatment team, which stymied communication and undermined trust. Such behavior could put society at risk because it would be far more difficult for those administering treatment to recognize warning signs that defendant was relapsing and becoming dangerous. She also stated no conditional release program in the state would take a defendant who was refusing any medication, whether for psychiatric or medical purposes. Finally, she reported a 2008 risk assessment study found defendant presented a moderate risk of violence.

At the end of the third hearing day, the trial court ruled from the bench. First, it believed the conditional release hearing had been premature and unnecessary because a prerequisite under section 1603 was absent: the state hospital did not support defendant's conditional release. Second, the trial court found defendant's conditional release would endanger the community. The court was particularly concerned about the evidence

5

defendant had refused to take Abilify and maintain open communications with his treatment team. It noted even defendant's expert Dr. Roeder believed "medication compliance is the 'foremost marker for dangerousness' " and had conceded the importance of, in general, keeping treatment providers appraised of financial matters. The trial court concluded defendant's lack of compliance pointed "directly to his potential for dangerousness in the community."

## DISCUSSION

"A person committed to a state hospital or other treatment facility under the provisions of Section 1026 shall be released from the state hospital or other treatment facility only under one or more of the following circumstances: [¶] (a) Pursuant to the provisions of Section 1026.2. [¶] (b) Upon expiration of the maximum term of commitment as provided in subdivision (a) of Section 1026.5, except as such term may be extended under the provisions of subdivision (b) of Section 1026.5. [¶] (c) As otherwise expressly provided in Title 15 (commencing with Section 1600) of Part 2." (§ 1026.1; see also *People v. Cross* (2005) 127 Cal.App.4th 63, 72.) "In this case, the only issue relates to the first option . . . whether defendant should be released pursuant to the provisions of section 1026.2." (*People v. Soiu* (2003) 106 Cal.App.4th 1191, 1195–1196 (*Soiu*).)

Section 1026.2 allows a defendant (or his treatment facility director or his outpatient program director) to submit an application for release based on restoration of sanity. (§ 1026.2, subd. (a).)[2] "Section 1026.2 involves what has been described as a

---

[2] Section 1026.2, subdivision (a), provides: "An application for the release of a person who has been committed to a state hospital or other treatment facility, as provided in Section 1026, upon the ground that sanity has been restored, may be made to the superior court of the county from which the commitment was made, either by the person, or by the medical director of the state hospital or other treatment facility to which the person is committed or by the community program director where the person is on outpatient status . . . ."

6

two-step process.  [Citations.]  The first step in the release process requires the defendant, who has filed a release application, to demonstrate at a hearing that he or she will not 'be a danger to the health and safety of others, due to mental defect, disease, or disorder, [if] under supervision and treatment in the community.'  (§ 1026.2, subd[.] (e).)[3]  If the court finds such at the hearing, the defendant is then placed in 'an appropriate forensic conditional release program for one year.'  (§ 1026.2, subd[.] (e).)  This is commonly called the outpatient placement hearing."  (*Soiu*, *supra*, 106 Cal.App.4th at p. 1196, italics omitted.)  "The second step in the release process, often referred to as the restoration of sanity trial, normally occurs one year after the defendant has been placed in an outpatient program."  (*Soiu*, *supra*, 106 Cal.App.4th at p. 1196.)  "Unlike during the first step in the proceedings, the restoration of sanity trial requires the defendant to demonstrate that he or she is no longer a danger to the health and safety of others under all circumstances."  (*Ibid.*)  This appeal concerns the first, not the second, step of the process.

The section 1026.2 process is distinct from, and should not be confused with, the process under title 15 and section 1600 et seq.  (See *People v. Sword* (1994)

---

[3]  Section 1026.2, subdivision (e), provides:  "The court shall hold a hearing to determine whether the person applying for restoration of sanity would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community.  If the court at the hearing determines the applicant will not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community, the court shall order the applicant placed with an appropriate forensic conditional release program for one year.  The court at the end of the one year, shall have a trial to determine if sanity has been restored, which means the applicant is no longer a danger to the health and safety of others, due to mental defect, disease, or disorder.  The court shall not determine whether the applicant has been restored to sanity until the applicant has completed the one year in the appropriate forensic conditional release program, unless the community program director sooner makes a recommendation for restoration of sanity and unconditional release as described in subdivision (h).  The court shall notify the persons required to be notified in subdivision (a) of the hearing date."

7

29 Cal.App.4th 614, 620 (*Sword*); see also *People v. McDonough* (2011) 196 Cal.App.4th 1472, 1490.)  Under the title 15 procedure, "a defendant *may* be placed on outpatient status if the director of the state hospital and the community program director so recommend, and the trial court approves the recommendation after hearing." (*Sword*, *supra*, 29 Cal.App.4th at p. 620, italics added.)  A defendant is not empowered, him or herself, to seek outpatient status under title 15, and indeed the status is a " 'discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [offender] and cause no undue hazard to the community.' " (*Ibid.*)  Since a decision to order outpatient status under title 15 is discretionary (§§ 1600, 1602, 1603; *Sword*, at p. 620 [all stating defendant "may be placed on outpatient status" if various conditions met]), such a decision is reviewed for abuse of discretion (*Sword*, at p. 619, fn. 2; *People v. Cross* (2005) 127 Cal.App.4th 63, 66 (*Cross*)).

When outpatient status is sought under section 1026.2, however, the statute specifies the trial court "shall" grant that status if it "determines the applicant will not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community." (§ 1026.2, subd. (e).)  "The statute's use of the term 'shall' signifies that the trial court has no discretion but must order" outpatient treatment "when the required factual showing is made." (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1504.)  Accordingly, the trial court is called on to make a factual determination, which we ordinarily review under the substantial evidence standard.  (*Id.* at pp. 1503–1505 [the "substantial evidence standard . . . is used in reviewing any disputed factual question, whether it arises at trial or otherwise"]; *id.* at p. 1503 [when conditional release of a sexually violent predator "shall" be granted upon showing of whether defendant "likely" to engage in such behavior due to a mental disorder if supervised and treated in the community, review of denial of release reviewed for substantial evidence]; see also *People v. Gregerson* (2011) 202 Cal.App.4th 306, 320

8

["If the court denies outpatient treatment" under the Mentally Disabled Offender Act (MDO), "its order will be affirmed if substantial evidence" supports necessary determination outpatient care not "safe and effective," the MDO statutory standard.].)[4]

There is ample evidence in the record supporting the trial court's implicit finding that defendant's release would pose a danger to the health and safety of others, including the evidence of defendant's refusal to take Abilify and other forms of noncompliance and guardedness creates too great a treatment challenge and too great a risk of danger. In fact, it appears, given defendant's recent refusal of medication and transfer to a locked unit, the situation is arguably worse than it was when defendant unsuccessfully applied for restoration of sanity in 2010. That defendant presented contrary evidence, or that the prosecuting attorney characterized this as a "close" case, does not change the fact that the trial court sat as the trier of fact and was entitled to credit the testimony of the state's witnesses, and that its ruling is supported by substantial evidence. " 'All presumptions favor the trial court's ruling, which is entitled to great deference because the trial judge,

---

[4] We recognize some decisions involving section 1026.2 have applied the same abuse of discretion standard applicable to title 15 proceedings. (See, e.g., *People v. Bartsch* (2008) 167 Cal.App.4th 896, 900 (*Bartsch*); *People v. Dobson* (2008) 161 Cal.App.4th 1422, 1433 (*Dobson*).) However, neither *Bartsch* nor *Dobson* analyzed use of the abuse of discretion standard and, instead, simply cited to *Sword* or *Cross*, cases that concerned the alternative, *discretionary* means of obtaining outpatient status under title 15. (*Sword*, *supra*, 29 Cal.App.4th at p. 619, fn. 2; *Cross*, *supra*, 127 Cal.App.4th at p. 66. Further, *Dobson*'s mention of the abuse of discretion standard occurred amidst a broad discussion of section 1026.2, and *Dobson* held only that an appeal from denial of a petition to restore competency under that section is not subject to "[*People v.* ]*Wende* [(1979) 25 Cal.3d 436]" review procedures. (*Dobson*, *supra*, 161 Cal.App.4th at p. 1435.) In any event, whether we employ the abuse of discretion or substantial evidence standard of review, the outcome we reach here is the same. Indeed, some courts have defined abuse of discretion in this context in a way that is practically indistinguishable from substantial evidence review. (See *People v. McDonough* (2011) 196 Cal.App.4th 1472, 1489 ["In determining whether the trial court abused its discretion, we look to whether the court relied on proper factors and whether those factors are supported by the record."].)

having been present at trial, necessarily is more familiar with the evidence and is bound by the more demanding test of weighing conflicting evidence rather than our standard of review under the substantial evidence rule. . . . [W]e do not reassess the credibility of witnesses or reweigh the evidence. To the contrary, we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor.' " (*Kelly v. CB & I Constructors, Inc.* (2009) 179 Cal.App.4th 442, 452.)

The issue is not, as defendant claims, whether he is *currently* dangerous. A determination under section 1026.2, subdivision (e), that a defendant would not be dangerous "[*if*] *under supervision and treatment in the community*" does not call on the trial court to assess how dangerous a defendant is in his or her secure, hospitalized environment. Section 1026.2 necessarily calls for extrapolation and hypothesizing in order to predict a future condition—namely, the defendant's behavior when supervised as an outpatient. (See *People v. Williams* (1988) 198 Cal.App.3d 1476, 1479, italics added [requiring trial court to give this jury instruction: " 'in order to have the Defendant's sanity legally restored, while in a medicated state, you must also find, by a preponderance of the evidence, *that the Defendant will continue to take his medication as prescribed*' "].) Nor does the trial court's decision here implicate constitutional concerns. (See *People v. Beck* (1996) 47 Cal.App.4th 1676, 1682 [outpatient release under section 1026.2 is not governed by constitutional mandates to release a defendant who is no longer mentally ill and would pose no danger if released outright without conditions].)

Given that the trial court's substantive finding under section 1026.2 is supported by substantial evidence, we need not address the court's alternative ruling that it should not have proceeded with a hearing without a positive recommendation from defendant's treatment providers. We note, however, the Attorney General has not defended this ruling, and the positive recommendation requirement appears applicable only in title 15 proceedings, not section 1026.2 proceedings. In any case, "we review the ruling, not the

court's reasoning and, if the ruling was correct on any ground, we affirm." (*People v. Geier* (2007) 41 Cal.4th 555, 582.)

## DISPOSITION

The order denying conditional release as an outpatient is affirmed.

_____
Banke, J.


We concur:


_____
Margulies, Acting P. J.


_____
Dondero, J.

11