Filed 3/2/22  P. v. Reynolds CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARQUIS JEHMAL REYNOLDS,<br><br>    Defendant and Appellant. | H048355<br>(Santa Clara County<br>Super. Ct. No. C1238975) |

Defendant was committed to a state hospital after he was found not guilty of murder by reason of insanity.  Following a year as a supervised outpatient, defendant petitioned the trial court for an unconditional release from his commitment on grounds that his sanity had been legally restored.  He appeals from the denial of that request, arguing that the trial court relied on irrelevant and insufficient evidence.  Finding no abuse of discretion or due process violation, we will affirm.

## I.  BACKGROUND

Defendant was found not guilty by reason of insanity for the 2012 murder of a homeless woman.  He stabbed the woman repeatedly while in a psychotic state, believing the woman was a witch who was going to steal his soul.  Defendant was committed to Napa State Hospital in 2013, where he was treated for schizophrenia.  In 2017, defendant petitioned the trial court for supervised outpatient status, which is a prerequisite to sanity being legally restored and requires a determination by the trial court that he is not "a danger to the health and safety of others, due to mental defect, disease, or disorder, if

under supervision and treatment in the community." (Pen. Code, § 1026.2, subd. (e).) The trial court made that determination following a hearing, and in May 2018 defendant was released from the state hospital to the Gateways Satellite Conditional Release Program in Southern California. In August 2018, he was transferred to the South Bay Conditional Release Program in San Jose (CONREP). In March 2019, the director of CONREP recommended that defendant's outpatient status continue for another year. Defendant disagreed with the recommendation. Seeking an unconditional release from his commitment to the Department of State Hospitals, he requested a trial under Penal Code section 1026.2, subdivision (e) to determine whether he no longer posed a danger to the health and safety of others and had thus been restored to sanity.

*Sanity Restoration Trial*

A court trial commenced in March 2020. A forensic psychologist, qualified by the trial court as an expert in psychology, risk assessment, and the assessment of future dangers, testified in support of defendant's unconditional release. The same psychologist had been hired by the defense in 2017 to assess defendant for supervised release, and she testified at the March 2018 hearing in favor of supervised outpatient status. The psychologist assessed defendant for unconditional release in May 2019. She met with defendant for about 75 minutes at that time, and conducted a 15-minute follow-up phone interview in August 2019 after reviewing CONREP's treatment and progress notes. She opined that defendant's symptoms were controlled by medication; defendant had been sufficiently educated regarding possible triggers and warning signs; and he had a demonstrated skill set necessary to remain stable without supervision such that he would not be a threat to himself or others if released unconditionally into the community.

A social worker employed by the Alternate Defender's Office testified that she was familiar with the Santa Clara County mental health system, which offered individual and group psychological therapy, medication management, and case management assistance. She was available to link defendant with the county system, and to navigate

2

any barriers or challenges along the way. Defendant's brother testified that defendant could live with him if released unsupervised. Defendant's brother saw defendant at least once a week since defendant had returned to San Jose, and his brother did not believe he was dangerous to others. Several members from the Narcotics Anonymous community testified that defendant was committed to his substance abuse recovery, demonstrated leadership, and was not dangerous to others.

Defendant testified that he was no longer in need of CONREP services because he had overcome the things he had been worried about upon his supervised release from the state hospital. He had abused cocaine for several years before entering the state hospital. He was committed to Narcotics Anonymous; continuing his antipsychotic medication in an unsupervised setting; and he would contact the National Alliance on Mental Illness (NAMI) or go to the hospital if he felt the onset of schizophrenia symptoms. He was scheduled to move to his brother's home within the week. He would engage his brother in "reality checks" (if he was still living with him), and he would "do what I need to do to get help" including contacting the county psychiatrist to assess his medication. He would contact NAMI instead of the county to arrange for therapy because with NAMI he could "get help right away instead of waiting." He believed he was not a danger to others because he understood his illness and has been educated on how to prevent its symptoms.

Trial resumed in May 2020 (after a delay presumably due to the COVID-19 pandemic). Defendant's CONREP therapist opposed his release from the program. The therapist, a licensed clinical social worker, had worked for Central Valley CONREP for 25 years, first as a forensic mental health specialist, then as an assistant program director, and for the past 12 years as the community program director. In 2019 she also served as the interim community program director for South Bay CONREP, and she maintained a small caseload in San Jose due to a staffing shortage. She was designated by the trial court as an expert in risk assessment and clinical treatment of psychiatric disorders.

3

The therapist described CONREP's five-step treatment plan:  The client enters the program and remains at the intensive treatment level with weekly individual therapy sessions for at least six months, after which the client steps down to the intermediate treatment level with three individual therapy sessions per month.  The supportive treatment level requires individual therapy twice per month, and the transition and aftercare treatment levels require individual therapy once per month.  The decision to move a client to a higher or lower level of supervision is made by a staffing team and is based on guidelines developed by the Department of State Hospitals.  The staffing team considers a client's psychiatric stability, insight into his or her mental illness, and program compliance.

Before assuming the role as defendant's primary therapist in December 2019, the therapist reviewed defendant's file including all documents provided by the state hospital.  Defendant was diagnosed with schizophrenia.  The positive symptoms of the disease (auditory hallucinations and thought delusions) had been successfully controlled with antipsychotic medication.  The medication was administered by injection every 28 days.  Defendant would pick up the medication from the CONREP office and take it to a pharmacy where a nurse would administer the injection.  Schizophrenia also manifests in various types of disturbed behavior, including agitation and impulsivity, which the therapist observed in defendant.

Defendant's initial community placement was in a controlled board and care setting.  Defendant transitioned to a less restrictive room and board setting where he was responsible for holding and taking his medication, and managing his physical health and living environment.  After a visit to the room and board facility spurred in part by defendant's complaints, the therapist found the environment unsatisfactory due to mold and deficient meals.  Because of limited alternative placement options, the therapist advocated to CONREP's treatment team (who felt defendant needed further monitoring before living independently) to place defendant in his brother's home, where defendant

4

would be responsible for preparing his own meals.  That transition occurred after a temporary placement in a different room and board facility while defendant's brother prepared for defendant's arrival.

Defendant was being supervised at the intermediate treatment level.  He was required to participate in individual therapy and therapeutic group sessions three times per month; test for controlled substances semimonthly; and meet with a psychiatrist bimonthly.  The therapist saw defendant more than three times every month before the pandemic lockdown.  They met beyond their scheduled therapy sessions to resolve issues with the operator of his former room and board facility and to collaborate on the move to his brother's home.  During the COVID-19 lockdown, she saw defendant at least monthly when she delivered his medication to his home, and they communicated by phone.  Defendant continued to arrange for the pharmacy to administer the monthly injection.

The therapist opined that defendant had gained insight into the precursors (or triggers) and overt symptoms of his schizophrenia, and he understood and accepted the need for medication.  But defendant displayed negative symptoms of the disease such as increased agitation due to his inability to tolerate change or obstacles.  The therapist was particularly concerned with defendant's behavior regarding certain group programs.  Defendant told the therapist "he did not like group, and that if he didn't like something [] he gets set in his ways, and he would choose not to participate."  He told her he would walk out of groups or not show up "because he didn't feel like it," he "didn't want to be there," and he "can get the information from someplace else."  The therapist reminded defendant that program participation was not optional, and suggested they work on his tolerance.  But defendant was not interested in discussing it or receiving suggestions on how to approach an unpalatable group.  He said he did not need or want to work on tolerance, he determines what is good for himself, and he did not like group.  Defendant's reaction concerned the therapist because it meant defendant was not open to receiving new information as part of his treatment, and shutting down was not an acceptable tool to

5

deal with uncomfortable situations. In the past, defendant had reacted aggressively to behavior and speech that he could not tolerate. (Defendant attributed an assault on an imam the day before the murder to his psychosis, but at another time he was tried and convicted of domestic violence which he did not attribute to psychosis.) The therapist felt defendant may not handle a triggering situation appropriately should he be released from CONREP because "if he does shut down, does not allow new information to come in or any kind of mediating information to come in, then he would simply react in a way that may be aggressive."

The therapist was also concerned with defendant's failure to manage his diabetes. Defendant had recently been hospitalized two or three times because his glucose level was too high. At one point defendant's blood sugar was measured at the CONREP office. Defendant had not eaten, his speech was slurred, and he was stumbling. The therapist cautioned him that he could fall, lose memory, and lose the ability to formulate a thought. A doctor had instructed defendant to switch to insulin, and defendant had delayed that treatment. In the therapist's opinion, defendant was not ready to be released from CONREP until there was demonstrated consistency in managing his total physical health. He was given clear directives from a physician to manage the diabetes and he did not follow through. If defendant's diabetes was not properly managed, defendant could fall into a multiple day sleep and lose track of time, which would impair his ability to manage his mental illness. He could also experience symptoms similar to schizophrenia such as delusions and hallucinations.

The therapist testified that defendant would not be successful in the community without his medication and psychiatric services. CONREP does not supply antipsychotic medication to its discharged clients, and the program typically assists its Medi-Cal clients such as defendant at the transition level of treatment to establish psychiatric care through county services. The two had not discussed that transition, which can be challenging.

6

In the therapist's view, defendant lacked insight in several areas which would jeopardize a safe release into the community. Defendant's frustration with CONREP's services diminished her confidence that defendant, if triggered, would act in a nonaggressive manner in the community based on his history of violence resulting from frustration. Defendant lacked a sufficient track record regarding his diet and diabetes; and he did not have a psychiatrist or mental health services in place to prescribe and administer his antipsychotic medication if immediately released. Defendant told the therapist that he will continue with his medication and Narcotics Anonymous meetings, stay with family, and look for a job when he is released from CONREP. Defendant had only recently transitioned to his brother's home. CONREP was paying defendant's rent and providing money for groceries. Defendant was subject to a curfew and needed CONREP permission to travel. The therapist described CONREP as a highly monitored program which provides a constant reminder to defendant that he is accountable to someone else for his behavior. She needed to be assured that in his more independent living arrangement defendant would manage his incidental funds appropriately, feed himself properly, and be accountable to someone such as a family member for any shifts in his mental health baseline.

*Trial Court Decision*

The trial court found that defendant had failed to demonstrate by a preponderance of the evidence that he is no longer a danger to the health and safety of others. The court therefore denied defendant's petition to restore sanity, and continued his conditional release status with CONREP. In its oral pronouncement, the court acknowledged defendant's commitment to sobriety, medication compliance, awareness of the symptoms and red flags of his schizophrenia, and his ability to reach out "when he has needed a reality check." At the same time, the court expressed concern with defendant's "ability to deal with frustrations and conflicts present in everyday life and his willingness to continue to undertake treatment, therapy, or programs that he finds unappealing." The

7

court acknowledged competing expert views regarding defendant's dislike for a particular group program: Defendant's expert described his reaction as "persistence and self-advocacy," while his treating therapist viewed the behavior as "shutting down when there are aspects of his treatment that he does not like or agree with." Ultimately, the trial court found an insufficient history of defendant "handling frustrations, treatment modalities that he finds unhelpful, and the like, in a manner that provides this Court with confidence that he will remain compliant with necessary treatment and medication without supervision." The court noted that its decision was influenced in part by defendant's demeanor at trial: "When confronted with these issues here before this Court, [defendant] sometimes demonstrated that he believed others were at fault in needing to ask clarifying questions of him, or that others were failing to understand him."

## II. DISCUSSION

A person who has been found not guilty by reason of insanity and committed to a state hospital may apply to the trial court for release on the ground that sanity has been restored. (Pen. Code, § 1026.2, subd. (a).) The Legislature has established a two-step procedure to reestablish legal sanity. If, after a hearing, the trial court determines that the person is not a danger to others while under outpatient supervision and treatment, the court shall order the person placed with the Department of State Hospital's conditional release program for one year. (Pen. Code, §§ 1026.2, subd. (e); 1615 [Department of State Hospitals administers the Forensic Conditional Release Program to oversee the community treatment and supervision of judicially committed patients].) The program is required to assess and report to the trial court on a client's readiness to transition to the community, and to provide quarterly and annual reports during the supervision period. (Pen. Code, §§ 1026.2, subd. (*l*), 1605, subd. (d), 1606.) Following at least one year with outpatient treatment and supervision, the court "shall have a trial to determine if sanity has been restored, which means the applicant is no longer a danger to the health and safety of others, due to mental defect, disease, or disorder." (Pen. Code, § 1026.2,

8

subd. (e).)  The applicant bears the burden of proof by a preponderance of the evidence. (*In re Franklin* (1972) 7 Cal.3d 126, 148.)

*Standard of Review*

We review a trial court's order denying a petition to restore sanity for abuse of discretion.  (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1433–1434.)  Under that standard, "it is not sufficient to show facts affording an opportunity for a difference of opinion."  (*People v. Cross* (2005) 127 Cal.App.4th 63, 73.)  " '[D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.' "  (*Ibid.*)

In the analogous review of a trial court's stated reasons for denying outpatient status to a civilly committed mentally disordered sex offender, the abuse of discretion standard has been articulated as examining whether the trial court relied on proper factors and whether those factors find some support in the record.  (*People v. Henderson* (1986) 187 Cal.App.3d 1263, 1269 (*Henderson*).)  The *Henderson* court described a trial court's discretion as "impl[ying] the absence of arbitrary determination, capricious disposition, or whimsical thinking."  (*Id*. at p. 1268.)  " 'When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion.  An appellate tribunal is not authorized to substitute its judgment for that of the trial judge.' "  (*Ibid*.)

*The Trial Court Did Not Abuse its Discretion in Denying the Petition*

Defendant argues the trial court abused its discretion by relying on his "[un]willingness to continue to undertake treatment, therapy, or programs that he finds unappealing" because his rejection of group programs is not relevant to whether he is dangerous to others.  In defendant's view, "[n]o court has ever held that complete compliance with all treatment programming is required under Penal Code section 1026.2," and nothing in the record showed why defendant's dissatisfaction with

9

an art therapy class establishes dangerousness. These are fair points in the abstract, but defendant overlooks the context presented here.

The treating therapist testified that defendant's agitation due to his inability to tolerate obstacles was a manifestation of his mental illness. In her opinion, his unwillingness to engage in therapeutic programs which he did not enjoy demonstrated a lack of tolerance which, if left unchecked, could manifest in an act of aggression. She viewed defendant as a safety risk because he lacked "the tools at this point to execute patience or some type of conflict resolution[] in a situation that may arise that will anger him that he doesn't agree with or that he feel[s] would be a threat to him." She expressed concern that the lack of insight could also undermine an unsupervised mental health maintenance plan if defendant reacted negatively to a treating psychiatrist or therapist. Defendant's demonstrated lack of tolerance was therefore relevant to whether, if released unconditionally, he would be dangerous to others. The trial court did not abuse its discretion by considering defendant's reactive behavior in adjudicating his petition for unconditional release.

Defendant argues that the trial court "took impermissible leaps of logic with minimal support from the record" in finding that he failed to demonstrate he will "remain compliant with necessary treatment and medication without supervision" and in finding that he lacked the "ability to deal with frustrations and conflicts present in everyday life." Defendant points to evidence showing he is committed to taking his medication, maintaining his sobriety, and working through his frustrations in a noncombative way. He argues such evidence provided "crucial context" to the dangerousness question, and "far more logically supports" his expert's view that he has and will continue to be compliant with his treatment while advocating for his needs. But defendant's argument ultimately reveals a difference of opinion between experts and not an abuse of discretion. As a reviewing court we do not substitute our judgment for that of the trial court. (*Henderson*, *supra*, 187 Cal.App.3d at p. 1268.)

10

The trial court was persuaded by the prosecution's expert that defendant may be a danger to others if released from CONREP supervision. The trial court's decision is supported by the record, including defendant's own testimony. Defendant's treating therapist had spent significant time with defendant between December 2019 and May 2020, including several hours engaged in individual therapy. In addition to her concerns related to the potential for defendant to "shut down," the therapist had concerns with defendant's ability to control his diabetes, be accountable to someone such as a family member for any shifts in his mental health baseline, and transition to county mental health services without an interruption in treatment.

Defendant's authorities do not persuade us otherwise. In *People v. McDonough* (2011) 196 Cal.App.4th 1472, the state hospital director recommended outpatient status for McDonough after an eight-year hospital commitment, and all testifying experts agreed outpatient treatment was appropriate. (*Id*. at p. 1475.) There the trial court found the details of the outpatient program lacking, and denied supervised release on that basis. (*Ibid*.) Reversing, the appellate court held that the trial court could not deny outpatient status to an individual who is no longer mentally ill or dangerous based on the patient's failure to identify an appropriate program of supervision and release. (*Id.* at pp. 1475–1476.) The statutory scheme placed the burden to identify an appropriate treatment program on the community program director, not the patient. (*Id*. at p. 1492; Pen. Code, § 1603, subd. (a)(2).) The *McDonough* court also criticized faulting him for not attending all group meetings, noting "there is no requirement that a patient having already learned what a particular course has to offer must continue to attend over and over and over again, year after year, a course that never changes its curriculum." (*McDonough*, at p. 1491.) In contrast here, defendant seeks unconditional release (not supervised outpatient status), and the experts disagreed as to his dangerousness if released from supervision. Defendant was not subjected to eight years of repeated classes; the trial

11

court's concern here was with defendant's hostility toward participation and lack of introspection rather than mere absenteeism.

*People v. Cross*, *supra*, 127 Cal.App.4th 63 also challenged the denial of outpatient status.  The state hospital recommended that Cross, who was 79 years old, be released under supervision to a skilled nursing facility.  All testifying health care professionals (a state hospital psychologist, a state hospital psychiatrist, a CONREP evaluator, a CONREP clinical program director, and the skilled nursing facility administrator) concurred with the recommendation, agreeing that Cross was not dangerous provided he took his medication.  (*Id*. at pp. 66–71.)  The denial of the requested outpatient release due to Cross's age, condition, and mental illness was found to be an abuse of discretion because those factors did not demonstrate dangerousness as long as Cross was properly medicated.  (*Id*. at pp.73–74.)  The proposed transfer was to a locked nursing facility where Cross would reside under constant supervision, with staff administering and monitoring his medication.  (*Ibid*.)  Here again, although defendant's psychotic symptoms are successfully controlled with medication, he is not seeking supervised and monitored release, and the testifying experts disagree about his dangerousness if unconditionally released.

*People v. Williams* (1988) 198 Cal.App.3d 1476 more closely resembles the facts here and supports our conclusion that defendant has not demonstrated an abuse of discretion by the trial court.  Like defendant, Williams was a supervised outpatient seeking unconditional release based on sanity having been restored.  (*Id*. at p. 1478.)  Williams successfully appealed a jury determination that his sanity had not been restored, on the ground that the jury had been misinstructed to disregard the effects of antipsychotic medication on Williams's behavior.  The *Williams* majority noted that all three experts in the case "agreed Williams's illness is well controlled with antipsychotic medication" and "without the medication Williams's remission would cease."  (*Id*. at p. 1481.)  But that evidence did not conclusively establish Williams's lack of

dangerousness if unconditionally released.  Even though substantial evidence was presented at trial "that Williams fully complied with the conditions of his hospital parole, and is not dangerous to himself or others while medicated," another trial was warranted in light of the testimony of the county psychologist that Williams would discontinue his medication based on his grudging participation in the county mental health program, and also considering the substantial time that passed since the original trial.  (*Id*. at pp. 1481, 1483.)  Here, as in *Williams*, there is evidence in the record that defendant is vulnerable to a treatment lapse if released unconditionally.

As the basis for defendant's commitment to the Department of State Hospitals continues to exist, we reject defendant's argument that his due process rights are violated by the denial of unconditional release.  (*Foucha v. Louisiana* (1992) 504 U.S. 71, 77 [an insanity acquittee "may be held as long as he is both mentally ill and dangerous"].)

## III.  DISPOSITION

The July 10, 2020 order denying defendant's petition to restore sanity is affirmed.

_____

Grover, J.

**WE CONCUR:**


_____

Greenwood, P. J.


_____

Lie, J.

**H048355 - *The People v. Reynolds***