Filed 7/18/23  P. v. Shaffer CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>CHARLES LEROY SHAFFER,<br><br>       Defendant and Appellant. | A164840<br><br>(Napa County<br>Super. Ct. No.<br>CR173868) |

Defendant Charles Leroy Shaffer was found not guilty by reason of insanity of killing his nephew in 2016 and was committed to the Napa State Hospital.  His commitment has been extended twice, once following a jury trial in 2019, and once in 2021 when he waived a trial and agreed to a two-year extension of his commitment.  Defendant appeals from the court's subsequent denial of his conditional release for outpatient treatment.  We conclude the court did not abuse its discretion and affirm.

**BACKGROUND**

*The Underlying Offense[1]*

"On Christmas day in 2014, defendant, along with his wife and son, visited relatives.  He drank beer throughout the day.  At one point, he pulled

---

[1]  Our factual summary is taken from our prior opinion affirming an order extending defendant's commitment under Penal Code section 1026.5.  (*People v. Shaffer* (Apr. 29, 2021, A158950) [nonpub. opn.]).  Citation of our

out a pocketknife and suggested killing some rabbits that were in cages and giving them to the neighbors. [¶] After dinner, defendant's wife and son went home. Defendant stayed and planned to get a ride home with his nephew and the nephew's girlfriend, who had not been drinking. The three of them left the gathering at about 10:15 p.m. Defendant was very intoxicated and needed help getting to the car.

"Defendant was in the rear passenger seat, his nephew was in the front passenger seat, and the nephew's girlfriend was driving. As they drove, the group chatted about what a nice Christmas it had been. The nephew asked defendant to stop kicking his seat, but 'nobody was mad.' When they drove onto a bridge, defendant started screaming, told the girlfriend to pull over, and said he was going to beat up his nephew.

"From the corner of her eye, the girlfriend saw defendant's arm coming from the back seat of the car, and 'thought he was hitting' his nephew. She saw defendant hit his nephew 'four or five times.' Defendant yelled 'pull the car over. I'm gonna beat the fuck out of this dude.' The girlfriend pulled over, and 'saw blood gushing from the side . . . of his head.' She called 911, but at that point did not realize defendant had used a knife.

"Defendant then seemed to 'snap[ ] out of it,' and 'looked kind of lost.' The nephew's girlfriend testified she believed defendant 'had some kind of episode.' When the 911 operator instructed her to put pressure on the nephew's wound, she gave her sweatshirt to defendant who put it on the wound.

---

prior unpublished opinion is permitted by California Rules of Court, rule 8.1115(b)(1) "to explain the factual background of the case and not as legal authority." (*Pacific Gas & Electric Co. v. City and County of San Francisco* (2012) 206 Cal.App.4th 897, 907, fn. 10.)

"Paramedics could not revive the nephew, and he was pronounced dead at the scene.  Police found a knife in the backseat of the car, and arrested defendant.  They took photographs of his nephew, the knife, and the inside of the car, some of which were admitted into evidence at the hearing.

"A criminalist estimated that defendant's blood alcohol level at the time of the killing would have been about .26, based on his tested blood alcohol level of .19 at about 3:00 a.m. in the morning after the incident.

"Defendant pleaded not guilty by reason of insanity to the charge of involuntary manslaughter and use of a knife, and was committed to Napa State Hospital." (*People v. Shaffer*, *supra*, A158950.)

At defendant's next hearing, a jury found defendant suffered from a " 'mental disease, defect, or disorder,' and as a result of that mental disease, defect or disorder, he 'now . . . [p]oses a substantial danger of physical harm to others if released; and . . . [h]as serious difficulty controlling his behavior if released.'  The court ordered his commitment at Napa State Hospital extended until December[] 2021." (*People v. Shaffer*, *supra*, A158950.)

In 2020, the court approved defendant's transfer to Canyon Manor, a locked facility, following a recommendation from Solano County CONREP that defendant be placed there as an interim step between hospitalization and outpatient treatment.  In September 2021, Canyon Manor recommended defendant's commitment be extended, and the People filed a petition to extend his commitment under Penal Code section 1026.5.[2]  Canyon Manor then submitted a recommendation for community outpatient treatment.  Defendant waived a jury trial on the section 1026.5 petition and agreed to the two-year extension of his commitment.  The court held a hearing to consider

---

[2]  All further undesignated statutory references are to the Penal Code.

whether defendant should be conditionally released for outpatient treatment with CONREP, under section 1026.2.

At the hearing, the nephew's girlfriend testified about his killing. She was driving defendant and his nephew, with defendant in the back seat, home after a party on Christmas day. The men were both very intoxicated, laughing and talking, when defendant started "yelling, telling [her] to pull the car over, that he was going to beat this guy's ass." She looked over and the nephew was bleeding from his neck. Defendant then "kind of snapped out of it and . . . tried to help [the nephew] breathe a little bit."

Napa County Sergeant Nathalie Hurtado investigated the killing. When she interviewed defendant around 3:00 a.m. the morning after the incident, he stated the last thing he remembered about being in the car was sitting in the back passenger seat behind his nephew and talking with him. He told her more than once he had a memory of being in the car. He also told her he remembered thinking about the Napa Smith Brewery when they were driving because "he himself own[ed] a brewery." The next thing he remembered was being in the Sheriff's Office. He reported he drank four to five beers that night. He also told her he had never blacked out from drinking alcohol.

A number of defendant's providers testified. Michlene Wojcieszak, his assigned CONREP clinician at Canyon Manor, testified she had been working with defendant for about 15 months. Defendant was at the highest level at the facility, which was based on his medication adherence, program attendance, self-care, and behavioral control. Wojcieszak worked with defendant on his trauma disorder, completing a PTSD workbook and helping him understand his triggers. She also accompanied him on community outings, including to his home and to the scene of the attack where he killed

4

his nephew.  Defendant was able to express his feelings and use his coping mechanisms to calm himself.

Wojcieszak also discussed defendant's alcohol use disorder with him in individual therapy.  She testified he "came in with a pretty solid commitment to abstain from alcohol.  But I have seen that sustained over time."  Defendant went on community outings to the farmer's market where Wojcieszak believed there was alcohol, and to a convenience store where alcohol was on display.  She acknowledged that "of course he could not partake [of alcohol] without us being aware of it and intervening."

Defendant testified he had not had access to alcohol since 2014.  He had been taking medication to reduce his craving for alcohol since he was at Napa State Hospital.  He raised the issue with Wojcieszak about stopping his medication while " 'under medical supervision to see if he is free of cravings without it.' "  They discussed the issue more than once, but "the consensus of the treatment team" was that he should continue the medication, "mostly" because CONREP prefers to make any medication changes in the community.

Wojcieszak believed defendant had a "pretty solid" relapse prevention plan and opined he would not be a danger to himself or others if he was treated in the community on an outpatient basis under CONREP supervision.  She agreed he could be a danger if he were released into the community and "drank alcohol and he became intoxicated."

An incident occurred during Wojcieszak's testimony, which was given remotely from Canyon Manor.  Defendant was apparently in the room at the time.  The following exchange took place:

"Q: [Defense counsel]: I'd like to speak with you particularly now about your work with Mr. Shaffer.  Can you tell us how long you've been working with Mr. Shaffer?

5

"A: I believe he was admitted in February. Oh. November. Sorry. I'm always mixing up his birthdate and his admission date. My bad.

"[The Court]: Mr. Shaffer, I think that's your voice that we're hearing in the background. You are not to assist the witnesses at all.

"[The Witness]: No. There is somebody in the hallway whose voice you hear right now.

"[The Court]: Okay. Who reminded you of his birthdate or his time there? Ms. Wojcieszak?

"[Defense Counsel]: Ms. Wojcieszak, it sounded like there was somebody—

"[The Witness]: Mr. Shaffer.

"[Defense Counsel]: It sounded like there was somebody who reminded you of when you had started, when Mr. Shaffer had arrived.

"[The Witness]: Yes. That was Mr. Shaffer.

"[The Court]: Okay. So again, Mr. Shaffer, you are not to assist the witness or any other witness at all. You've had your opportunity to testify. Please do not do that.

"(Court reporter informs the court she didn't hear what Mr. Shaffer said.)

"[The Court]: That's okay. It was muffled, but apparently it was enough for this witness to remember when she started working with him, and that's inappropriate to assist the witness while on the witness stand."

Sharon Kay, the clinical program manager at Canyon Manor, testified she had been involved in the evaluation of defendant's readiness to be released. She had signed the report prepared by Wojcieszak, relying on her statements about defendant's treatment. The consensus of the treatment team, with which Kay agreed, was that defendant could be safely and

6

effectively treated in the community through CONREP. Kay noted that therapists had taken defendant into the community twice "for some experiences that would trigger his P.T.S.D to see how he did." Kay agreed he had been sober during the outings, and they could not accurately test defendant's behavior if intoxicated. She explained " I don't know if you can even predict. I think that [defendant] is committed to staying sober, and I think he needs to, and I think he knows that." When asked "But you can't say with any level of certainty that [defendant] isn't going to be released and consume alcohol and become dangerous, correct," she responded "I don't think I could say that for sure."

Robin Payne, a CONREP program director, had assessed defendant for outpatient treatment when he was at Napa State Hospital in 2018. At their first meeting, defendant stated he planned to "continue his beer brewing business and perhaps taste the beer for quality." In their second meeting, he denied saying that. In both meetings, he "stated an intent to stay sober."

Dr. Melanie Cleary, a forensic evaluator and hospital liaison clinician, testified as an expert in forensic psychology and the assessment of the mentally ill for safety and efficacy of outpatient treatment. She met with defendant about seven times beginning in 2019, with about half of the meetings in person and half via video conference. She had no access to his Canyon Manor medical records, but "relied on email communications from Ms. Wojcieszak about his progress and status."

Dr. Cleary testified defendant was "noted to be psychiatrically stable, meaning that he hasn't experienced any symptoms of his diagnosis, which is other specified trauma and stressor related disorder, which in this case has encompassed some symptoms of P.T.S.D." Defendant was able to correctly identify his diagnosis and his symptoms. Defendant reported he had not

experienced any cravings for alcohol.  Based on Dr. Cleary's communications with Wojcieszak, "it sounds like [defendant] has been making excellent progress in that area where he's been able to confront difficult situations, and be able to address his feelings about it, and emote appropriately."  Dr. Cleary believed defendant was committed to maintaining his sobriety because "[h]e's very thoughtful about what things could trigger a desire to drink. . . ."  Dr. Cleary testified she had been unaware that defendant had asked to stop his medication under medical supervision.  Dr. Cleary agreed that "raise[d] some level of concern."

Of the 600 to 800 patients she had evaluated, she could not recall another who had a dual diagnosis of trauma-related disorder and alcohol abuse disorder where the patient was not violent when sober.  Dr. Cleary also testified defendant had told her his memory of the offense was being at a Christmas party, drinking heavily, and his nephew and nephew's girlfriend agreeing to take him home.  He also told her he remembered "talking to a police officer on the side of the road after the offense occurred."  She did not know defendant had told a police officer at the time that he remembered being in the car and driving on Highway 29.  It would "be a concern . . . if he wasn't sharing with [her] as much as he remembered about the offense.

Defendant's wife testified defendant was "honest . . . trustworthy . . . a wonderful father, and a wonderful husband, wonderful caregiver."  She described him as "one of the most patient people I know. . . .  He's not an angel, but he's a very decent human being."  She had assisted in his release planning by obtaining information from their health insurance provider, and phone numbers for the V.A., the Veteran's Crisis line, and the Fairfield V.A. Clinic at Travis Air Force Base.  She asked a neighbor to be his AA sponsor, and he agreed to be a sponsor for defendant "if he needs to."  Defendant's wife

did not think defendant started drinking more than one glass of beer or wine a night until about six months before he killed his nephew. She had no concerns about defendant's safety or the safety of others if he was released.

Defendant's wife testified about incidents that occurred when defendant had been drinking. One night in about 2000, when he was very intoxicated, he came home with a female friend. His wife discovered them having sex in the living room, but defendant later explained he thought the woman was her. His wife did not talk with defendant about whether his alcohol use could potentially be a problem because she did not think he had a problem.

Defendant's wife also testified about a 2013 incident at a party with some co-workers. Defendant's wife brought him to the party, but she left early. She later got a call from a friend to come and pick him up. Defendant was on the side of a highway, intoxicated. He was "too drunk to tell [her] what happened" "but he didn't remember hitting [two friends]." After the incident, she "wasn't concerned about his alcohol consumption. [She] just didn't want him with those people because of that incident."

One of those people testified about the incident. L.P. and her husband, who worked with defendant, hosted a party in 2013 attended by defendant and his wife. Defendant's wife left early, and told the hosts to call her when defendant was ready to leave and she would pick him up. Around 10:00 p.m., L.P. called her to pick up defendant, who was intoxicated, but did not hear from his wife in the next hour. L.P. then called B.K., a friend who was the designated driver for the day, to drive defendant home.

B.K. arrived at the party and picked up defendant. He and L.P. sat in the driver's and front passenger seats, respectively, and defendant sat in the back seat. As soon as they got on the highway, defendant began punching

9

B.K. in the head. L.P. turned around and calmed him down, but less than 20 seconds later, he began choking B.K. L.P. turned around and told defendant "That's [B.K.] . . . [h]e's our friend. You work with him. And that's when [defendant] said, excuse me, shut up fucking bitch, and elbowed me in the side of the head." L.P told B.K. to pull over, got out of the car, and called her husband. Defendant was still hitting and choking B.K., who managed to subdue him until L.P.'s husband arrived. L.P. described defendant's attack on B.K. as "unprovoked." Defendant called her the next day to apologize, but "he didn't know what he was apologizing for. . . . He didn't know what he did."

L.P. had also observed defendant engage in other problematic behavior while intoxicated. On one occasion he walked up to an African American man at a bar and "started saying racial slurs and got in his face." On another occasion defendant confronted a man selling knives, got in his face, and an altercation ensued. L.P. testified "anything can tip him off, like walking into a bar and seeing someone at a bar that he thinks shouldn't be there."

Defendant testified he had worked as a machinist and welder at Travis Air Force Base and had been married for 25 years. He had served in the Air Force, including active duty in Germany and Turkey, and two tours in Afghanistan. Defendant believed his experiences in the military affected his mental health, causing him to be "hypervigilant," and have nightmares, flashbacks, and anxiety attacks.

Defendant testified he had no memory of killing his nephew when he was in custody early the next morning. He first learned his nephew was dead when Sergeant Hurtado told him during his custodial interrogation. Up until that point, he "had no idea why" he was in custody. He believed he could not remember the event due to a "combination of dissociation out of part of the

10

symptoms of [his] disorder . . . compounded by being intoxicated on alcohol." Defendant testified he experienced trauma-related symptoms, including fear of being in an enclosed space, sleep difficulties, hypervigilance, and flashbacks, while in jail after the offense.

Defendant understood his diagnosis to be "other trauma or stressor-related disorder . . . basically, it's PTSD, minus a characteristic or trait." When asked if it was his only diagnosed disorder, he indicated he also had "a mild alcohol use disorder."

Defendant was admitted to Napa State Hospital in March 2017. There, he participated in numerous groups, including anger management, substance recovery, PTSD recovery, and a veteran's group. He attended job training and worked in the upholstery shop for three years. He was also a representative for the "cooperative council," which involved "go[ing] down to the treatment mall, gather[ing] information, [and] bring[ing] it back and disseminat[ing] it through the group." Later, he was the secretary for Alcoholics Anonymous.

In November 2020, defendant was transferred to Canyon Manor, his placement at the time of the hearing. There, he continued to attend various groups, including behavioral therapy, substance recovery, and discharge planning. He had weekly therapy sessions with Wojcieszak, in which they discussed substance abuse, trauma symptoms, and stressor-related disorder. They also spent four months working on a 400-page workbook together, covering PTSD, triggers, stressors, and exposure therapy.

As part of his exposure therapy, defendant went on outings with social workers in which he was exposed to "things that in the past have triggered" him. The outings included going out at night in the backseat of a car and going to the scene of the stabbing.

11

Defendant had a "relapse prevention plan," which was "a living document because it's pretty much never finished." He explained it "captures what happened from the instant offense to all kinds of other things, such as the medication I take, support systems, being people or organizations, services out there, high-risk situations, affirmations."

He testified the symptoms of his alcohol use disorder included "dissociation or blackout, . . . erratic behavior, things I wouldn't normally say or do. Could be rude, loud, obnoxious. You know, just things. Not the normal me." His relapse prevention plan as to alcohol use was to "talk to somebody when I have something bothering me. . . . [¶] . . . I've got a friend now who has offered to be my sponsor. . . . I would talk to him, talk to my family. And I've got hotline phone numbers for the VA. I've got my doctor at Kaiser. When I go to CONREP, I'll have several contacts there that I'll deal with. . . . Just, I have lots of ways. Meetings you can go to. I prefer the SMART recovery model. But there [are] also 12-step groups everywhere. And I have . . . a very wide variety of family, as well as friends' support. . . ."

If released on CONREP, defendant's housing plan was staying at a room and board with others in Vallejo. He would attend groups, meet weekly with a therapist and monthly with a doctor, and be subject to random drug and alcohol screening. Eventually, he would move back to his own home with the same conditions.

On cross-examination, defendant was asked about blacking out because of alcohol use. He testified he had blacked out three times after drinking; once during the incident when his wife walked in on him having sex with another woman in their home, once when he was being driven home from the party at L.P.'s house and attacked a friend, and once during the killing of his nephew. He admitted it was "possible" he lied to his wife about not

remembering having sex with the other woman because it would be easier than admitting it to her. As to the incident when he attacked his friends in the car, defendant told his wife he did remember what happened, even though he did not. He conceded he had lied to his wife, "in a way." Although defendant had previously told psychologist Dr. Minagawa, who interviewed him at the Napa jail, that he had blacked out more than 10 times, he now believed it was only three times.

Defendant testified he was committed to sobriety and denied having cravings for alcohol. He was taking medication to stop those cravings, and was not sure if he raised the possibility of stopping it with Wojcieszak or if she did. He admitted he liked the smell and taste of beer. During his exposure therapy field trips into the community, he was sober, and had visited restaurants where alcohol was served but not bars. The brewery business he previously owned closed down during the first year he was in Napa State Hospital.

## DISCUSSION

Defendant asserts the trial court abused its discretion by denying him conditional release for outpatient treatment.

"A defendant found not guilty by reason of insanity may be released from a state hospital upon (1) the restoration of sanity pursuant to the provisions of section 1026.2; (2) expiration of the maximum term of commitment, which means 'the longest term of imprisonment which could have been imposed for the offense or offenses of which the person was convicted' (§ 1026.5, subd. (a)(1)); or (3) approval of outpatient status pursuant to the provisions of section 1600 et seq. (§ 1026.1; see *People v. Soiu* (2003) 106 Cal.App.4th 1191, 1194–1195. . . ." *(People v. Dobson* (2008) 161 Cal.App.4th 1422, 1432.)

13

"Under the latter procedure, a defendant may be placed on outpatient status if the director of the state hospital and the community program director so recommend, and the trial court approves the recommendation after hearing. (§ 1603.) [¶] 'Outpatient status is not a privilege given the [offender] to finish out his sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [offender] and cause no undue hazard to the community.' (*People v. Wymer* (1987) 192 Cal.App.3d 508, 513. . . .)" (*People v. Sword* (1994) 29 Cal.App.4th 614, 620 (*Sword*).)

"Outpatient status is a prerequisite to a finding that sanity has been restored. (§ 1026.2.) 'Subdivision (e) of section 1026.2 sets up a two-step process for processing an application for release: first, a determination of whether the applicant should be placed in a local program, and later, after a year in such a program, a determination of whether the applicant's sanity has been restored.' (*Barnes v. Superior Court* (1986) 186 Cal.App.3d 969, 973. . . ; *People v. Tilbury* (1991) 54 Cal.3d 56, 60 . . . . [no right to jury trial on outpatient placement].) At the end of one year, the trial court may either discharge the defendant, order confinement in a treatment facility, or renew its approval of outpatient status. (§ 1606.)" (*Sword, supra,* 29 Cal.App.4th at pp. 620–621, fn. omitted.)

Defendant has the burden of proving, by a preponderance of the evidence, that he is either no longer mentally ill or not dangerous. (*People v. Cross* (2005) 127 Cal.App.4th 63, 72 (*Cross*).) As the party who was found to have not satisfied his burden of proof below, he must show on appeal that the evidence compelled a finding in his favor as a matter of law. (See e.g., *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279; *In re I.W.* (2009)

14

180 Cal.App.4th 1517, 1528, overruled in part on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1004, fn. 4.)

We review the trial court's order for abuse of discretion. "Under that standard, it is not sufficient to show facts affording an opportunity for a difference of opinion. [Citation.] 'A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation.]' (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65. . . .)" (*Cross, supra,* 127 Cal.App.4th at p. 73.)

Defendant maintains the court abused its discretion, in part, because his treatment providers all opined, he could be "safely and effectively treated in the community."

While the trial court "was not required to follow the essentially unanimous recommendations of the expert witnesses" it "could disregard those recommendations only for nonarbitrary reasons." (*Cross, supra,* 127 Cal.App.4th at p. 73.)

The trial court identified multiple nonarbitrary reasons. First, the court noted there were "issues of credibility . . . here in court and . . . some of the things [defendant's] said out of court" and questioned whether defendant had been truthful. The court noted "integrity is important here, because all of the [p]eople who are, quote, unquote, treating him are using his statements to sort of figure out what's going on with him. Because obviously you can never know what's going on in someone's head. So you have to listen to their statements. The court noted the incident during Wojcieszak's testimony, stating defendant attempted to provide an answer to a question to her and

15

then denied it.[3]  The court also noted the discrepancy between Robin Payne's testimony that defendant said he wanted to taste beer at his brewery and defendant's denial that he ever said that.  The court additionally questioned the veracity of defendant's testimony that he never had cravings for alcohol, given the extent of his alcohol consumption before being institutionalized.[4]  And the court noted Dr. Cleary testified she had been unaware that defendant had asked to stop his medication under medical supervision.  Dr. Cleary agreed that "raise[d] some level of concern."

The court described defendant as "sort of a test case," because his treatment providers had not had experience with someone with his particular dual diagnosis who was not violent while sober.  The court also noted Wojcieszak had never used the workbook completed by defendant before, concluding "so basically there hasn't been anyone else like [defendant], apparently, in the treatment careers of these people. . . ."

The court also expressed concerns about the extent of defendant's "exposure therapy," noting "I certainly would hope that his, quote, unquote, exposure therapy is more than just going to a farmer's market with the belief that there might be alcohol there, because Ms. Wojcieszak was not certain,

---

[3]  Defendant asserts the transcript states it was Wojcieszak, not defendant, who stated there were people in the hallway, and then she "corrected herself" and said it was defendant who gave her the information. The transcript, however, only identifies the speaker making the initial statement as "The Witness."  The court stated it was defendant, both at the time of the initial statement and when the court made its ruling, and at neither time did defendant's counsel object nor state the court was mistaken.

[4]  The record also reflects other instances of defendant's lack of veracity and attempts to minimize his behavior.  For example, defendant testified he had only blacked out three times in his life after consuming alcohol, but he previously told Dr. Minagawa it was about 10 times.  He also admitted lying to his wife.

16

and then going to—I think there was testimony about a grocery store and there being alcohol on the shelves. To me exposure needs to be more to really test this out. Because you can't give him alcohol and say let's see what he does. But you can certainly put him in other situations where it's being consumed right in front of him and seeing what he does to see whether or not he truly is of the mind and able to control himself and not crave them."

Defendant disputes the court's conclusions, maintaining that at Canyon Manor, "[d]espite the availability of alcohol, [he] abstained." He also asserts that "[d]espite the availability of contraband . . . [he] had been sober since the commitment offense in 2014." These assertions directly contradict defendant's testimony that he has had no access to alcohol since 2014. The portions of the record cited by defendant in support of these claims do not support his assertions. Those record cites indicate alcohol was available in the jail in which defendant was placed after the offense, not at Canyon Manor or Napa State Hospital. The other portion of the record cited by defendant is Wojcieszak's testimony in response to the question "How is it that you're able to gauge one's ability to confront any underlying substance abuse disorders and to succeed in confronting those *once they're released to outpatient treatment*?" (Italics added.) She responded: "Well, we do rely heavily on the groups . . . that focus[] on recovery and the person's performance *in that setting*. . . . [¶] But . . . we do random testing, because, you know, contraband does—can get brought in, and people can drink when they're out on a pass, although our CONREP folks are never unsupervised, so that's not going to happen with them." (Italics added.) Her testimony was about the availability of alcohol when an individual is receiving outpatient treatment under CONREP, not about the availability of alcohol at Canyon Manor. There was, in fact, no evidence that alcohol was available at Canyon Manor,

17

or that if it was, defendant had access to it.  The only evidence that defendant abstained when alcohol was available was his testimony that he abstained from alcohol while in jail, prior to his commitment to Napa State Hospital and prior to his placement at Canyon Manor.

Defendant asserts the circumstances in his case are like those in *Cross, supra,* 127 Cal.App.4th 63, in which the appellate court reversed the trial court's denial of outpatient status.  There, the defendant pled guilty to second degree murder of a former roommate, and the court found he was not sane at the time of the offense.  (*Id*. at p. 66.)  He was diagnosed with schizophrenia, paranoid type.  (*Id*. at p. 68.)  "While in a decompressed state, [defendant] suffered from delusions, hallucinations and paranoia."  (*Ibid*.)  After 12 years at a state hospital, the hospital recommended outpatient status for the 79-year-old defendant.  (*Id*. at pp. 68–69.)

A number of medical professionals testified.  The CONREP evaluator testified the defendant should be placed in a skilled nursing facility because he was "physically fragile" and placement in skilled nursing facility "meant he would be under close ('24/7') supervision."  (*Cross, supra,* 127 Cal.App.4th at p. 68.)  Defendant had undergone heart surgery about two years earlier, had fractured his hip about eight years before, and "was ambulatory with a walker."  (*Id*. at pp. 69–70.)  As long as the defendant took his medication, the evaluator "felt he was stable enough to be placed in the conditional release program."  (*Id*. at p. 68.)

A staff psychologist and staff psychiatrist from the state hospital both testified the defendant had not been a behavioral problem while "in the hospital under treatment and medication."  (*Cross, supra,* 127 Cal.App.4th at p. 69.)  He was "at some risk for alcohol abuse . . . but would be 'okay' in a structured setting."  (*Id*. at p. 70.)  The assistant administrator of the skilled

18

nursing facility testified it was "a secured, locked facility with near perpetual monitoring of its fenced grounds." (*Ibid*.) It had "about 160 employees for about 179 patients," and was staffed by registered nurses, licensed vocation nurses, and certified nursing assistants. (*Ibid*.) The staff "would take whatever steps were necessary to have him become compliant or remove him from the facility." (*Ibid*.) A CONREP psychologist testified "while there was a higher correlation with violent behavior in younger persons, that was not a sole factor" on which he based his opinion. (*Id*. at p. 71.) He noted defendant would have "24-hour supervision and structured support." (*Ibid*.)

The appellate court reversed, in a two-one decision, the trial court's denial of the request for conditional release. (*Cross, supra,* 127 Cal.App.4th at p. 75.) The court observed the record "revealed no reasons to doubt the adequacy of the experts' knowledge regarding [defendant's] history or status." (*Id*. at p. 74.) The court noted the trial court had cited his "age and condition," but concluded "[i]f anything, [defendant's] advanced age of 79 and frail condition supported granting the application, as they doubtless rendered [defendant] less physically able to move about or inflict harm upon anyone." (*Ibid*.) Notably, the "proposed transfer was not to an 'out-patient' program, but to a locked nursing facility in which [defendant] would reside under constant supervision." (*Ibid*.)

The circumstances in this case are patently different than those in *Cross*. Defendant in this case has a different, and rare, dual diagnosis, being treated in part with methods his providers have not used before. Defendant is not elderly—he was born in 1964. There was no evidence he was physically frail or unable to ambulate without a walker, which would reduce the risk of dangerousness. And the "outpatient" placement in *Cross* was a locked skilled nursing facility, in which the medical professionals would "take whatever

steps necessary" to compel him to comply with his medication regimen. Defendant was seeking release to a room and board where he would see a therapist weekly and a doctor monthly.

In sum, although the trial court disagreed with the testifying medical professionals' recommendations that defendant be released on CONREP, the court's conclusions at the end of the hearing demonstrate that this denial was based upon a thorough consideration and reasonable interpretation of the evidence. Defendant has not shown an abuse of discretion.

## DISPOSITION

The judgment is affirmed.

_____
Banke, J.

We concur:


_____
Humes, P.J.


_____
Margulies, J.

A164840, People v. Shaffer

21